# UNITED CIGAR STORES COMPANY *v.* YOUNG.

PLEADING; FALSE ARREST AND IMPRISONMENT; PROBABLE CAUSE; COR-
PORATIONS; PRINCIPAL AND AGENT; QUESTIONS FOR JURY; TRIAL; EVI-
DENCE.

1. Where a declaration contains two counts, and there is sufficient evi-
   dence to warrant the submission of either count to the jury, refusal
   to grant a general motion for a directed verdict is not error. (Fol-
   lowing *Washington Asphalt Block & Tile Co.* v. *Mackey*, 15 App. D.
   C. 410.)

2. Where a citizen acts in good faith in assisting the officers of the law to
   apprehend and bring to the bar of justice those guilty of crime, or
   against whom probable cause exists for belief that a crime has been
   committed, such action is to be commended, and not condemned.
   (Following *Pickford* v. *Hudson*, 32 App. D. C. 480.)

3. Reasonable cause for prosecution must exist before an arrest is justi-
   fiable. (Citing *Davis* v. *United States*, 16 App. D. C. 454.)

4. Where a felony has been committed and there is reasonable cause for
   suspicion that a particular person has committed it, his arrest is
   justifiable.

5. Probable cause *held* not to exist, as a matter of law, for the arrest of
   a clerk in a store, the safe in which had been burglarized after mid-
   night, where he had a key to the store and knew the combination of
   the safe, as did other clerks; was in sole charge of the store when it
   was closed before midnight, accounted in detail for his movements
   after closing the store and before reaching home; gave the alarm
   promptly next morning on opening the store, and told one of the
   officers making the investigation that, as nearly as he could say,
   there were about $500 in the safe, and another, that it contained
   Saturday and Sunday's sales, amounting to $500 or over, although
   he had not counted the money.

6. For acts done by the agents of a corporation, either *in contractu* or *in
   delicto* in the course of its business and of their employment, the
   corporation is responsible as an individual is responsible under simi-
   lar circumstances.

7. In an action by a former clerk of a corporation engaged in conducting
   a chain of retail stores in various cities, against the corporation for
   false arrest on a charge of having burglarized after midnight a
   safe in the store in which he was employed, it was *held* that the trial
   court did not err in submitting the question of whether the officers

and agents of the defendant causing the arrest to be made were acting within the scope of their authority, where it appeared, among other things, that the local inspector of the defendant, having general supervision of its local stores, telegraphed the fact of the burglary to his superior, the defendant's superintendent of sales in New York, who responded in person and conferred with detectives, with the result that the plaintiff was taken to police headquarters, and interviewed in the presence of the superintendent, who endeavored to recover from the plaintiff the stolen money, and who thereafter discharged the plaintiff from the defendant's employment because of his suspicion of the plaintiff's guilt.

8. Where detectives came to a store which had been burglarized, and said to one of the clerks, who knew them to be detectives, "We want you," and the local manager of the store took the keys of the store from the clerk; one of the officers said to him, "Hurry up, and get your hat and come on;" the officers refused to allow him to telephone to his wife; an officer walked on either side of him on leaving the store, and sat on either side of him in a street car on the way to police headquarters; inquiry was made at headquarters, "Have you got him," and the superintendent of the store then remarked to him, "We have brought you down here,"—it was *held* in an action for false arrest and imprisonment by the clerk against his employer, that there was sufficient evidence as to whether such duress was used as to constitute false imprisonment, or whether the plaintiff's act in going with the officers was voluntary.

9. A defendant sued for false arrest cannot be said to have been harmed by the submission to the jury of the question whether there was reasonable ground for suspicion that the plaintiff was guilty, where, on appeal, it is held as a matter of law that probable cause of suspicion did not exist.

10. Publication is an essential element of slander.

11. Publication being an essential element of slander, the burden is upon the plaintiff to prove it by a fair preponderance of evidence. If, however, a third person is shown by the plaintiff to have been present in a very small room when the slanderous words were spoken, it is for the jury to say whether such person did or did not hear them.

12. The denial by a witness that he heard slanderous words is not conclusive, where it is admitted that he was within 6 or 8 feet of the parties, did not testify that he was busy at the time, remembered the occurrence, "that these two men were talking together in his room about this matter," that is, about the burglary, and that they were talking in an ordinary conversational tone, especially where his testimony is given nearly three years after the event.

13. In the cross-examination of a plaintiff suing for false arrest, he was asked "whether or not other clerks had keys to the store," and answered in the affirmative. He was then asked how many, and who, and replied, "I know M. and D. had keys, and also the combination of the safe. I am not quite sure whether B. had keys to that particular door or not." No objection was interposed to this answer. He was then asked, "Did you have the combination of the safe?" and answered, "Yes, sir; and Z. had the combination of the safe, and also about forty other clerks that had been discharged." *Held*, that the answer was responsive; and also that considerable latitude should be allowed the trial court under such circumstances.

14. It is not error to refuse to permit detectives to state whether the movements of a person suing for false arrest were restricted while at police headquarters, it being for the jury to say whether, upon the evidence as to what occurred at the time, he was under restraint.

15. Refusal by the trial court to instruct the jury at the instance of the defendant, that the plaintiff, suing for false arrest, could not recover if he voluntarily accompanied the officers to police headquarters, is not error, where the declaration contains a count in slander as well as for false arrest, and where, furthermore, the court in its general charge fully covers the question.

No. 2155. Submitted January 4, 1911. Decided February 6, 1911.

HEARING on an appeal by the defendant from a judgment of the Supreme Court of the District of Columbia, on verdict, in an action for slander, assault, malicious prosecution, and false arrest and imprisonment. *Affirmed.*

The COURT in the opinion stated the facts as follows:

This is an appeal [by the United Cigar Stores Company, a corporation], from a judgment of the supreme court of the District in an action of slander, assault, malicious prosecution, and false arrest, growing out of a burglary which occurred in one of the defendant's retail tobacco stores in this city, and in which $508 belonging to the defendant was taken. A general verdict for $2,500 was returned upon the counts alleging false arrest and slander, the other counts having been withdrawn from the consideration of the jury.

The plaintiff, Charles S. Young, a cigar salesman of five

and one-half years' experience, was twenty-five years of age and married at the time of his alleged arrest. He had worked for the defendant for almost two years at various times, and in May or June of 1907 he was again employed by it, and stationed in its store at the corner of Fifteenth street and New York avenue, N. W., in this city. A Mr. Madison was then chief clerk and a Mr. Bouvier was manager and inspector for defendant's stores in Washington. On Sunday, June 23d, 1907, Mr. Madison, Mr. Dempsey, another clerk, and the plaintiff were on duty in said Fifteenth street store. Owing to its being Sunday, all the clerks save the plaintiff left at 6 o'clock in the evening, and from that time until 11 o'clock, when he closed the store according to the usual custom, the plaintiff remained in charge. According to his testimony he then went to a lunch room, and after he had lunched, started home. When near home, noting a crowd of people in front of a house where some disturbance had occurred, he "spoke to two policemen on the beat," reaching home at 20 minutes after 12, and retiring almost immediately. In opening the store the next morning, in the due course of his duty, at a little before 7 o'clock, he observed that the time lock, which registers the time the door is opened, already had been turned. He turned the other lock and entered the store. Plaintiff then discovered that the safe had been opened, the strong box therein torn to pieces, and the money that it had contained taken. The safe had been opened by means of the combination. The plaintiff testified that at that time he did not know how much money had been in the safe, but afterwards learned through Mr. Bouvier that it amounted to about $508. Plaintiff immediately informed two police officers whom he found near the store of what had occurred, and they made a hasty inspection of the place, plaintiff assisting. The plaintiff then notified Mr. Madison, the chief clerk, and later Mr. Bouvier. Plaintiff continued to work until Friday, June 28th. He testified that on that day he opened the store as usual and worked until about 8 o'clock, when two men whom he recognized as detectives came into the store and said, "We want you;" that he answered, "I think you are mis-

taken; you don't want me;" that Mr. Bouvier then asked for
his keys, which he surrendered: that when plaintiff hesitated
about complying with the officers' suggestion that he accompany
them, they said, "Hurry up and get your hat and come on;"
that he requested time to telephone his wife, to which request
they answered, "You will have plenty of time to telephone your
wife, you will have all day to talk to her in;" that plaintiff
turned to see what Mr. Bouvier was going to do, when Detec-
tive Weeden "kind of pushed me out of the door, putting his
hand on my shoulder;" that he then walked down New York
avenue with one detective on either side of him, boarded a
street car at Fourteenth street, and after he got on the car the
detectives sat on either side of him; that he started to pay his
own fare but that they said, "No, we will pay your fare;" that
Detective Burlingame "looked at the conductor and smiled and
the conductor looked back at him and winked his eye;" that
plaintiff was not informed where they were going and did not
know their destination; that they finally reached detective head-
quarters, where they were met by another man, who asked,
"Have you got him?" that he was first put into a room where
people were walking in and out; that Detective Burlingame
then said, "Wait and I will take you back here into a small
room and get you out of the way, so everybody won't see you;"
that he was then taken into a very small room which, it sub-
sequently developed, was a telephone room, about 10 by 12
feet; that there were two men in the room, whose identity was
not known to him; that he then heard Mr. Steinecke, the super-
intendent of the sales department of the defendant company
for all territory east of Chicago except New York city, say,
"Let me go in and talk to him first;" that Steinecke seemed
very much excited; that he came into the room where the plain-
tiff was, *the two gentlemen remaining;* that Steinecke then
said to the plaintiff, "We have brought you down here, and if
you will come here and sit down and tell me the truth about
this thing, I will listen to you;" that thereupon plaintiff him-
self "got very mad and excited;" that during the conversation
that ensued Steinecke said, "Don't you know that the bonding

company will hold you for this money, and that we don't lose it?" That Steinecke also asked, "Young, didn't you go back to the store at 1 o'clock?" that plaintiff replied, "No, sir, I did not. I was in bed at that time;" that Steinecke replied, "We have a man who will say he saw you there at 5 minutes of 1;" that Steinecke then left the room for a few minutes and then returned, and in the course of the talk that ensued he said, "Do you realize that you will never be able to get a bond again in the United States? * * * Young, the best thing you can do for yourself is to get that money and bring it back;" that the detectives then took him into another room in which was Captain Boardman, Detectives Burlingame and Weeden, Mr. Madison, and Mr. Steinecke, and that after being subjected to a cross-examination in which all save Madison participated, he was permitted to go; that he "guessed" he was at detective headquarters for about an hour, but that it seemed much longer; that Steinecke followed him out of Captain Boardman's room, walked up to him, and said, "I want that button," referring to the identification button used by the clerks in the store; that Steinecke then said, "Young, you can consider yourself discharged." The plaintiff testified that aside from the effect the experience produced upon his nerves, he was greatly hampered thereby, and prevented from obtaining as remunerative employment as formerly. Witness further testified that there was usually more money in the store on Sunday nights than on any other night, because the receipts of both Saturday and Sunday were kept in the store, owing to the closing of the bank at noon on Saturday. He also testified under cross-examination that he thought the two men were in the small room while the conversation took place with Steinecke, but that he was "too excited to look to see who was in the room."

Plaintiff introduced the deposition *de bene esse* of Mr. Steinecke, who also testified for the defendant. From his deposition and testimony it appeared that his duties were to see that the stores were properly stocked and conducted; that he had authority to employ and discharge clerks, and exercised it when necessary, but not usually; that he arrived in Washington on

June 27th, 1907, when the burglary was reported to him by the local inspector, Mr. Bouvier; that he made such an inspection as the regular course of his duties demanded; that he and Mr. Bouvier then met the detectives, probably at the defendant's principal store on Pennsylvania avenue; that Steinecke then had a conversation with the detectives in reference to the burglary. He admitted that he "may have told them that I did not see who else could be responsible outside of Young; that he had the keys, closed up, and opened up, and so on;" that he might have said, "It certainly looks like it is up to Young." One of the detectives, according to Steinecke's testimony, then said that the Captain (Boardman) would like to talk to Young some time the next day, and asked Steinecke "whether Young could be permitted to come down there;" that he informed him that Young could go at almost any time, and it was finally arranged to have one of the clerks who ordinarily came on at 9 or 10 o'clock in the morning come on an hour or two earlier the next morning to relieve Young. Steinecke admitted that he was at detective headquarters before Young reached there, but denied that he requested Young's arrest, or that he was authorized to make such a request. He further testified "that he told the police officials that he had no authority to order arrests for his company, and that he could have no part in any arrest if one should be made." He also denied using the specific language attributed to him by Young during their interview at detective headquarters. He, however, admitted saying to Young "that a man who once is turned down by a bonding company, or detected in a dishonest act, cannot get bond anywhere in the United States."

Mr. Bouvier, who, as previously noted, was the local manager and inspector for the defendant, when called by the plaintiff, testified that, on the day following the burglary, he advised the company in New York of the occurrence by telegraph. To whom he telegraphed does not appear, except from his testimony on cross-examination, when called as a witness for the defendant. He then testified "that while he telegraphed to Mr. Steinecke, the superintendent, a report of the robbery on the day thereafter, Mr. Steinecke did not reach Washington

until four or five days later;" and that upon the night of Mr. Steinecke's arrival in Washington the witness "made a full oral report of the matter" to him.

The testimony of the defendant tended to show that while the police officers were making the preliminary examination of the store after the notification by Young on the morning following the burglary, Young had stated to them "that as near as he could say there had been about $500 in the safe;" that their examination of the store upon that occasion showed that it was impossible for anyone to have entered it except by way of the door, and that whoever made such entry must have had a key.

Upon the argument of the case at bar it was conceded that, according to the time lock, the store had been entered at 1 o'clock in the morning; that is to say, 1 o'clock Monday morning.

Detective Weeden, who, with Detective Burlingame, made the alleged arrest, testified that upon the occasion of said alleged arrest, he and Detective Burlingame entered the store, and that he, addressing Young, said, "Young, we would like to have you go to headquarters," and that Young, after inquiring when, said, "All right;" that when they got to headquarters Young was asked "to stay in the telephone room until the roll call was over." The witness continued: "When the roll call was over, I went out and got Young, and took him into Captain Boardman's office, and we questioned him." The witness further testified that Young was willing to go to police headquarters, that no force was used in any way, and that Young remained at headquarters about thirty minutes, after which "he went out about his business." The witness did not remember whether or not he conversed with Steinecke the night before Young was taken to headquarters, "but that, if he did have a talk with him (Steinecke), it was either at police headquarters or at the store at Fifteenth and New York avenue." The witness denied that he had asked Steinecke's permission to take Young to police headquarters. Detective Burlingame's testimony was substantially in accord with that of the proceeding witness, except that he admitted, under cross-examination, "that

he probably had a conversation with him (Steinecke) before Young was brought to police headquarters." He also admitted that he might have asked Steinecke's permission to take Young to headquarters.

The telephone operator at police headquarters, referred to by Young in his testimony, testified that the telephone room was probably 10 by 12 feet; "that he remembers two men sitting in his room in June, 1907, in connection with the investigation of the burglary at the United Cigar Stores store at Fifteenth street and New York avenue; that these two men were talking together in his room about this matter, but that he did not hear anything that was said by them, although they were talking to each other in an ordinary conversational tone;" that he should judge they were 6 or 8 feet from him during their conversation. The witness was not asked whether there were other persons in the room at the time mentioned. Neither did Steinecke testify that Robinson was the only person present besides himself and the plaintiff.

Mr. Madison, the chief clerk of the defendant, testified that he returned to the store at 10 o'clock on the night of the burglary, when he found no one on duty but a little boy, "shortly after which Young came up from the cellar, seemingly very much excited, but explained that he had gone into the cellar for a glass of water." Under cross-examination, witness stated that the water cooler was kept in the cellar, but that it was a violation of the rules of the company for a clerk to leave the store to go into the cellar or elsewhere when on duty alone.

There was also testimony tending to show that the duties of the superintendent of the sales department of the defendant, that is, Steinecke's duties, were not defined in writing.

At the close of all the evidence, counsel for the defendant submitted a general motion for a directed verdict on the ground "that there was no evidence in the case legally sufficient to sustain a verdict for the plaintiff." This motion was overruled and exception noted. Thereupon counsel for the defendant submitted nine instructions for the jury, five of which were granted and four refused. The court thereupon, of its own motion,

instructed the jury, the charge covering every phase of the issues to be determined.

Upon the question as to whether the plaintiff was falsely imprisoned, the court said in part: "If the circumstances of the occasion, the identity of the officers, and manner and nature of their address to the plaintiff, were such as to induce in the mind of a reasonable person the belief that they were forcibly about to remove him by physical power, if need be, if he did not go voluntarily, and if, under such circumstances, he yielded to go along, that would be imposition of such mental duress as would amount to false imprisonment. But if, under all the environment of circumstances that appealed to the mind of the plaintiff at the time, a reasonable man would not have apprehended that the police officers were about to force him to go to the station house if he refused, then, in such a situation of fact, there would not be the element of mental duress such as is necessary to amount to a false imprisonment, if there were compliance with the demand." The jury were then told that "a police officer has the right to arrest without a warrant if he has reasonable grounds to believe that a felony has been committed, and if, in addition to that, he has reasonable grounds to think that the person whom he arrests is guilty of that felony." Attention was then directed to the fact that admittedly a felony had been committed: "So in this case, if those officers had reasonable grounds to believe—that is to say, if a man of reasonable prudence and caution, in their situation, knowing what they knew, hearing what they heard, would have believed that this plaintiff was guilty of stealing the money, then they would have the right to arrest him, even though he was not guilty. If they had the right to arrest him, and did arrest him, then, even though defendant occasioned the arrest, the defendant cannot be responsible, because, if the officers had the right to arrest him, and did arrest him, the imprisonment was lawful, and the motives which influenced anyone in procuring the officers to do what they had a right to do would not render that person responsible for damages to the person arrested." It was then explained to the jury that even though they should find

that an unlawful arrest had been made, "the defendant could not be responsible for that, unless it actually and affirmatively procured the officers to do the unlawful thing of arresting him, when they had no right to believe him guilty of the offense. But when I say 'procured' the officers to do it, I mean procured in the sense of being the affirmative movers in the effort which resulted in the apprehension of the man by the officers.  *  *  * Therefore you will have to decide, from all the circumstances appearing upon that point that will aid you in determining the question, if you find that one of the officers of the corporation procured the officers to arrest Young  *  *  * whether the corporation, by the nature and scope of the affairs to be transacted in Washington which it had committed to its particular manager or employee, committed such an authority to operate in Washington on its behalf as carried with it the authority and right on behalf of the corporation to institute criminal proceedings against dishonest employees, if you find that authority was so broadly vested, the corporation will be responsible for what the employee did in that regard. If you find that it was not so general as to commit to such officer that authority to proceed in its behalf, then what he did in that respect would be his own individual, personal conduct, and would in no sense be obligatory upon the corporation or its stockholders."

As to the count in slander, the court said in part: "Now, this fourth count of the declaration claims that the defendant corporation, through its manager, falsely charged the plaintiff with the crime of larceny. Whether or not you find that the manager did charge the plaintiff with the crime of larceny, the liability of the defendant to respond to it would depend upon the same considerations that I have already given you; that is to say, whether the authority that manager was discharging in the city of Washington, which had been committed to his hands by the corporation, to discharge there, was so broad as to commit to him the right to speak on behalf of the corporation concerning the guilt or the innocence of its employees. If it did, it would be responsible for what he did. Otherwise, not." The

jury were then told: "But the mere speaking of the words, although you find them to have been slanderous, does not make or give rise to the technical action of slander, because, as I have already pointed out, the right to recover for slander depends upon whether or not one's reputation has been affected. Inasmuch as one's reputation cannot be affected unless a false report is put current, the false words must be spoken in the presence or hearing of a third person; not necessarily two, but they must have been said in the hearing of at least one person. Otherwise, they never have been made public, never have been put out, never have been launched forth, so as to have any effect whatever upon the reputation of the person complaining. That would cause you to determine from the evidence, if the words were spoken and were slanderous, whether, if defendant were responsible for them, they were spoken in the presence and hearing of a third person. If they were, they would be slanderous. If they were not, an element essential to the maintenance of a cause of action for slander would be absent, and there would be no recovery." This last instruction was in harmony with one of the defendant's prayers which had been granted. At the close of the court's charge, the defendant, through its counsel, noted the following exceptions: "I would like to ask an exception to so much of your Honor's charge as says that mental domination may constitute a false imprisonment; and to so much of your Honor's instructions as says that reasonable ground for suspicion after felony committed is a question of fact for the jury; and in respect to the fourth count, that the offense of slander can be made out without actual proof that the alleged slanderous words were heard by a third person; I say it was not proved here that any third person heard them."

*Mr. Frederick D. McKenney, Mr. John S. Flannery,* and *Mr. William Hitz* for the appellant.

*Mr. W. Gwynn Gardiner* for the appellee.

Mr. Justice ROBB delivered the opinion of the Court:

1. The motion for a directed verdict being general, it follows that if there were sufficient evidence in support of either of the two counts which were submitted to the jury to warrant such a submission, the refusal of this general motion was not error. In a case like the present, a general motion for a verdict by direction is necessarily based upon the premise that there has been a failure of proof as to each count of the declaration. The language of Mr. Chief Justice Alvey in *Washington Asphalt Block & Tile Co.* v. *Mackey,* 15 App. D. C. 410, is apposite: "Upon this evidence, the defendant moved the court to instruct the jury to return a verdict for the defendant, upon the ground that the plaintiff had failed to make out such case as entitled him to have the case submitted to the jury. This application was refused, and, we think, rightly so. The prayer was that the case should be instructed out of court without any reference whatever to the different counts of the declaration. Whether there was evidence sufficient to support both counts of the declaration, or only one, or neither of them, the court had to determine as a preliminary question; but if there was evidence sufficient to be submitted to the consideration of the jury, in respect to either one of the counts of the declaration, a general prayer for verdict upon the whole declaration could not be granted."

The cases relied upon by the defendant in this connection are either cases where the motion was made to strike out certain counts of the declaration on the ground of lack of evidence to sustain them, or cases where prejudicial error was committed by the trial court in its charge to the jury as to some particular count, the verdict being general. It is obvious that those cases are not in point.

We therefore proceed to inquire whether the plaintiff has made out a case for the jury upon either of the two counts under consideration.

As was said by Mr. Justice Van Orsdel in *Pickford* v. *Hudson,* 32 App. D. C. 480–486: "Where a citizen acts in good faith in assisting the officers of the law to apprehend and bring

to the bar of justice those guilty of crime, or against whom probable cause exists of the commission of crime, such action is to be commended, and not condemned." It is equally essential, however, that some protection be afforded the citizen against ill-advised and unfounded prosecutions. Indeed, it frequently happens that the wrong and injury thus done are not measurable in dollars and cents. For this reason the law demands that "reasonable cause for prosecution of the defendant must exist before his arrest is justifiable" *Davis* v. *United States,* 16 App. D. C. 454; *Kirk* v. *Garrett,* 84 Md. 405, 35 Atl. 1089. This is settled law, the only difficulty being its application in a given case.

In the present case a felony had been committed. This point being conceded, the question is whether, when the alleged arrest took place, there was reasonable cause for the suspicion that the plaintiff had committed the crime. If there was, his arrest was justifiable. What was the evidence against him? He had been employed by the defendant at various times, aggregating about two years. He had a key to the store, as did other clerks. He knew the combination of the safe, as did other clerks. He was in charge of the store preceding the burglary, but no significance can be attached to this fact, because it is conceded that the burglary did not occur until after the store had been closed for the night. In fact, it is not contended that the burglary occurred until a time subsequent to the hour at which plaintiff testified he reached home. When questioned concerning his movements after he closed the store for the night, he stated in detail what he did; that he first went to a lunch room, and then walked towards home; that just before he reached home, he talked with two police officers. All this information was known, or easily might have been known, prior to plaintiff's alleged arrest. But, it is insisted, the plaintiff was in the cellar of the store at 10 o'clock, contrary to the rules of the company. The safe was not in the cellar, but the water cooler was. It is difficult to perceive the connection between this incident and the burglary. Reduced to its last analysis, the only evidence tending in any degree to connect the plain-

tiff with this crime is the testimony of the police officers who made the initial investigation, to the effect that the plaintiff then said "that as near as he could say there had been about $500 in the safe;" or, as stated by another officer, "he said that the box contained Saturday's and Sunday's sales, amounting to $500 or over." Counsel for the defendant contends that plaintiff could not have known how much money was in the safe unless he had counted it. We do not think the inference deduced from this testimony a reasonable one. The plaintiff, as previously stated, had been employed by the defendant a sufficient length of time to know approximately, at least, the amount of a day's sales. He knew, as did other clerks in the store, that on Sunday nights the safe contained the receipts of two days' sales. Conceding the recollection of the officers as to the time when the plaintiff made the statement attributed to him to be correct, we find nothing in this statement justifying a suspicion against the plaintiff. His conduct subsequent to the burglary was entirely consistent with the theory of innocence. He promptly gave the alarm, notified his superiors, and answered all questions directed to him. There was not a word of evidence tending to disprove his statements as to his movements on the night of the burglary, and, as above stated, the only circumstance that differentiates the plaintiff from his associates in the store is the statement attributed to him as to the approximate amount of money in the safe at the time. In our minds there lingers no doubt as to the insufficiency of this evidence on the question of reasonable cause. Suspicion is one thing; reasonable cause for suspicion is frequently quite another thing. We rule, therefore, as matter of law, that reasonable ground for suspicion that plaintiff was guilty did not exist at the time of his alleged arrest.

It is further urged, however, that, aside from the question of reasonable cause for suspicion, there was no evidence legally sufficient to warrant the finding that "any of the officers or agents of the defendant corporation were authorized by the company to have the arrest made which is complained of in plaintiff's declaration."

The rule as expressed in *Philadelphia, W. & B. R. Co.* v. *Quigley,* 21 How. 202–210, 16 L. ed. 73–76, is "that for acts done by the agents of a corporation either *in contractu* or *in delicto* in the course of its business and of their employment, the corporation is responsible as an individual is responsible under similar circumstances."

The court in *Washington Gaslight Co.* v. *Lansden,* 172 U. S. 534–544, 43 L. ed. 543–548, 19 Sup. Ct. Rep. 296, after approving the doctrine of the *Quigley Case,* said: "The result of the authorities is, as we think, that in order to hold a corporation liable for the torts of any of its agents, the act in question must be performed in the course and within the scope of the agent's employment in the business of the principal. The corporation can be held responsible for acts which are not strictly within the corporate powers, but which were assumed to be performed for the corporation and by the corporate agents who were competent to employ the corporate powers actually exercised. There need be no written authority under seal, nor vote of the corporation constituting the agency or authorizing the act. But, in the absence of evidence of this nature, there must be evidence of some facts from which the authority of the agent to act upon or in relation to the subject-matter involved may be fairly and legitimately inferred by the court or jury," citing cases. The court was careful to say that there need not be evidence of authority, express or implied, in order to render the company liable, but that "there must be some evidence from which an authority might be implied on the part of the manager to represent the company as within the general scope of his employment, in regard to the subject-matter." In the *Lansden Case,* which was an action for libel, it was sought to hold the gas company responsible for the act of its gas engineer, who "was appointed generally to take care of the works and do the best he could for the company," in writing a letter containing libelous matter to the publisher of a periodical called "The Progressive Age," in response to a letter from said publisher, addressed to the gas company, seeking information concerning the object of plaintiff's alleged attack upon the gas com-

pany in the course of his testimony before a congressional committee. The court ruled that there was "nothing to show that any correspondence whatever, upon the subject in hand, was within the scope of the manager's employment." While the manager testified that he was not acting in his capacity as general manager in conducting the correspondence in question, the court was again careful to state that the defendant would not have been bound by such testimony if there had been other evidence in the case "from which a contrary inference could properly be drawn,—evidence from which it could be inferred that the manager was acting within the scope of his employment as manager; in such a case it would be proper to refer the question of fact to the jury to ascertain whether the letters were written within the scope of his employment, notwithstanding his assertion that he wrote them in his personal capacity."

In the present case it was in evidence that Steinecke was superintendent of sales of all the defendant's stores east of Chicago, except New York city. It was admitted that his duties were not defined in writing; that it was his duty to see that the stores were properly stocked and cared for, "that the clerks conduct themselves properly, and that the stores are run according to the policy of the United Cigar Stores Company." It was also admitted that he had authority to hire and discharge clerks. From this and other testimony it was evident that he was really a general or supervising manager for defendant. Mr. Bouvier testified that he (Bouvier) was inspector for the defendant in Washington; "that as said inspector his duties covered the general supervision of all the stores in Washington;" that he was a subordinate of the sales department, of which, as we have seen, Steinecke was general superintendent; that "he telegraphed to Mr. Steinecke, the superintendent, a report of the burglary on the day thereafter," and that "upon the night of Mr. Steinecke's arrival in Washington, the witness made a full oral report of the matter" to him. It was in evidence that one or more interviews were held with the detectives on the same evening, and that during those interviews it was determined that Young should be taken to police headquarters

on the following morning. Having all this in mind, that Stein-ecke was the company's principal representative here, that he was present during the interview at police headquarters, and, according to plaintiff's testimony, endeavored to recover for his company from the plaintiff the money that had been stolen, we think the court was justified in submitting to the jury the question whether the defendant, to use the language of the learned trial justice, "by the nature and scope of the affairs to be transacted in Washington which it had committed to its particular manager or employee, committed such an authority to operate in Washington on its behalf as carried with it the authority and right on behalf of the corporation to institute criminal proceedings against dishonest employees."

From the testimony it may fairly be assumed that the de-fendant had a large number of retail salesmen in its employ. It is apparent, therefore, that it would be to the interest of the company to bring about the arrest and punishment of such em-ployees as had betrayed their trust by the commission of a crime like the one of which Steinecke suspected the plaintiff to be guilty. It is likewise apparent that the recovery of the stolen money would benefit the defendant. Taking into con-sideration all the facts and surrounding circumstances, we think it may fairly be inferred that Steinecke's acts were with-in the general scope of his employment.

The burglary of one of defendant's stores was an unusual occurrence, demanding investigation and action of some sort. A telegram was sent immediately after the event to New York by the local manager. Whether that particular telegram was addressed to Steinecke or to some other official does not clearly appear, but it does appear that Steinecke was the only repre-sentative of the company to respond thereto. Everything he did after his arrival was done in the supposed interest of his principal; and in this connection it should be noted that the plaintiff's discharge by Steinecke was because of Steinecke's suspicion that plaintiff was guilty of burglarizing the store. We have held that the evidence did not warrant such a sus-picion, and yet the defendant permitted this act of Steinecke

to stand.  To that extent, at least, it adopted and ratified what he had done.  The acts complained of and those admittedly within Steinecke's authority were so closely related that we think the jury were justified in charging both to the same source.

It follows from what we have said that the court was justified in submitting the case to the jury.

There was no specific exception to the action of the court in submitting to the jury the question of the responsibility of the defendant for the slander uttered by Steinecke, and no exception to the charge of the court in reference thereto; therefore, in view of our finding that defendant's motion for a directed verdict was not well taken, we do not deem it necessary to pass upon that question.

2. Was there error in the court's charge as to what constitutes imprisonment in the eyes of the law?  We think not. The identity of the detectives when they appeared at the store for the purpose of taking the plaintiff to police headquarters was known to him.  It was for the jury to determine just what was said and done on that occasion, and just what took place when police headquarters were reached.  If the plaintiff's testimony was accepted by the jury, it clearly warranted the finding that he was justified in assuming that, unless he yielded to the demand of the detectives to accompany them, force would be used.  The first statement attributed to the officers, "We want you;" the fact that Mr. Bouvier, the local manager, then took the plaintiff's keys; the words of the officer, "Hurry up and get your hat and come on;" the officers' refusal to permit him to telephone to his wife; the fact that a detective walked on either side of the plaintiff to the street car, and remained on either side of him in the car; the inquiry when detective headquarters were reached, "Have you got him?" the remark of Steinecke that, "We have brought you down here;"—all, taken together, justified the belief in the mind of the plaintiff that physical force would be brought to bear if he refused to accompany the officers or remain with them when headquarters were reached.

In *Hebrew* v. *Pulis,* 73 N. J. L. 621, 7 L.R.A.(N.S.) 580, 118 Am. St. Rep. 716, 64 Atl. 121, the court said: "The essential thing is the constraint of the person. This constraint may be caused by threats as well as by actual force, and the threats may be by conduct or by words. If the words or conduct are such as to induce a reasonable apprehension of force, and the means of coercion are at hands, a person may be as effectually restrained and deprived of liberty as by prison bars. Unless it is clear that there is no reasonable apprehension of force, it is a question for the jury whether the submission was a voluntary act, or brought about by fear that force would be used." To the same effect are: *Goodell* v. *Tower,* 77 Vt. 61, 107 Am. St. Rep. 745, 58 Atl. 790; *Gunderson* v. *Struebing,* 125 Wis. 173, 104 N. W. 149; *Brushaber* v. *Stegemann,* 22 Mich. 266; *Gold* v. *Campbell,* — Tex. Civ. App. —, 117 S. W. 463.

3. In the third assignment of error it is contended that the question as to what constitutes reasonable ground for suspicion after a felony has been committed, the facts being determined, is one of law, for the court. It is unnecessary to consider this assignment, for we have ruled that, conceding the facts to have been as contended by the defendant, probable cause of suspicion did not exist. It, of course, follows that the defendant could not have been harmed by the submission of the question to the jury.

4. Did the court err in its charge to the jury respecting the publication of the slanderous words?

The court correctly told the jury that publication is an essential element in an action for slander. The court's charge on this point was a mere elaboration of the defendant's fourth prayer, which the court granted. In that prayer the jury were told "that no action of slander can be maintained unless the alleged slanderous words are published, that is, communicated to some third person, and such words spoken in the presence of a third person must be shown to have been within his hearing." Publication being an essential element of the action, the burden is upon the plaintiff to prove it by a fair preponderance of evidence." If, however, a third person is shown to have been pres-

ent when the slanderous words were spoken, it is for the jury to say whether such person did or did not hear them. Townshend, Slander & Libel, sec. 107; *McGeever* v. *Kennedy,* 19 Ky. L. Rep. 845, 42 S. W. 114; 25 Cyc. Law & Proc. p. 365.

What was the testimony before the jury as to publication? Plaintiff testified that there were two men in the telephone room besides himself when Steinecke entered, and that they "remained in the room." In cross-examination he said that he thought the two men were in the room, but that he was "too excited to look to see who was in the room;" but he had already testified that it was during Steinecke's conversation that he "got very mad and excited." Both Steinecke and Robinson, the telephone operator, testified for the defendant, and neither was asked whether there was a fourth person present. Clearly it was for the jury to determine whether there was.

Taking the court's charge on this subject as a whole, the jury must have understood that before they could return a verdict for the plaintiff they must find actual publication of the slander. Even the denial of the witness Robinson that he heard the conversation is not conclusive in the circumstances existing when the conversation occurred. He admitted that he was within 6 or 8 feet of the parties, did not contend that he was busy at the time, remembered the occurrence, "that these two men were talking together in his room about this matter," that is, about the burglary, and that they were talking in an ordinary conversational tone. Having all those facts in mind, and the further fact that the witness was testifying nearly three years after the event, it was for the jury to say whether his testimony was consistent with reason; in other words, whether his recollection was or was not correct.

The cases relied upon by the defendant upon this point are not inconsistent with this conclusion. In *Sheffill* v. *Van Deusen,* 13 Gray, 304, 74 Am. Dec. 632, the proof merely showed that the defamatory words were spoken "at the dwelling house of the defendant, and in that part thereof called the bakery, where bread and other articles were sold to customers." There was no testimony that a third person was present. The court

said: "It is quite immaterial in the present case that the words were spoken in a public place. The real question for the jury was, were they so spoken as to have been heard by third persons?"

In *Sullivan* v. *Sullivan,* 48 Ill. App. 435, the objectionable language was uttered in the presence of three young children, to whom it was meaningless. The court took the position that there was no difference between such a case and one where such words were uttered in a foreign language, in the presence of one who did not understand them.

The difference between those two cases and the present case is apparent. Accepting, however, for the purposes of this case, the denial of the witness Robinson that he heard the defamatory words, we still have the uncontradicted testimony of the plaintiff to the effect that another person was in the room. Considering the size of the room, we think the plaintiff's testimony as to the presence of the fourth party, if accepted by the jury, was prima facie evidence of publication. Considering the surrounding circumstances, the jury might well have concluded that the presence of Robinson and a fourth person at the interview was not the result of accident; in other words, that had plaintiff made any admissions prejudicial to himself, he would have been confronted later by those witnesses. Indeed, it was admitted by Steinecke in his testimony that he suspected plaintiff to be guilty; and it is apparent from the evidence that the real purpose in taking the plaintiff to police headquarters was to obtain a confession from him.

5. This assignment relates to certain rulings upon the admission and rejection of evidence, the first being directed to the refusal of the court to strike out, as not responsive, an answer of the plaintiff.

In the cross-examination of the plaintiff, he was asked "whether or not other clerks had keys to the store," and answered in the affirmative. He was then asked how many, and who, and replied, "I know Madison and Dempsey had keys, and also the combination of the safe. I am not quite sure whether Mr. Bouvier had keys to that particular door or not."

No objection was interposed to this answer. He was then asked, "Did you have the combination of the safe?" and answered, "Yes, sir; and Mr. Zimmerle had the combination to the safe, and also about forty other clerks that had been discharged." The object of the question being to show opportunity on the part of the plaintiff, we agree with the learned trial justice that the answer was reasonably responsive. No effort was made to disprove plaintiff's statement, and if it had been untrue, that could easily have been done. If it was true, a categorical answer would have conveyed an entirely erroneous impression to the jury. Considerable latitude is and should be accorded the trial court in matters of this kind, that the interest of justice may be subserved.

There were certain exceptions to the refusal of the court to permit the detectives to testify whether the plaintiff's movements were restricted while he was at police headquarters. The court permitted full inquiry as to what actually took place. It was for the jury to say whether this constituted restraint.

6. The court's refusal to grant certain prayers of the defendant is the subject of this assignment; but all save one of the points thus raised have already been covered.

In the defendant's fifth prayer, which was refused, the court was asked to instruct the jury that if they should find that the plaintiff "voluntarily accompanied the officers to police headquarters," he could not recover. While this request was general, and left out of view entirely the count in slander, the court in its charge, as previously set forth, fully covered the question.

Having considered all material contentions of the appellant, and having found that no error was committed at the trial, the judgment is affirmed, with costs.                    *Affirmed.*