Andrew R. **MALLORY**, Appellant,

v.

**UNITED STATES** of America, Appellee.

No. 12915.

United States Court of Appeals District of Columbia Circuit.

Argued March 26, 1956.

Decided June 28, 1956.

Certiorari Granted Oct. 22, 1956.

See 77 S.Ct. 103.

---

Mr. William B. Bryant, Washington, D. C. (appointed by the District Court), with whom Messrs. William C. Gardner, Joseph C. Waddy and William A. Tinney, Jr., Washington, D. C., were on the brief, for appellant.

Mr. John D. Lane, Asst. U. S. Atty., with whom Mr. Leo A. Rover, U. S. Atty. at the time the brief was filed, and Messrs. Lewis Carroll and Arthur J. McLaughlin, Asst. U. S. Attys., were on the brief, for appellee.

Before PRETTYMAN, BAZELON and BASTIAN, Circuit Judges.

PRETTYMAN, Circuit Judge.

Appellant was indicted, tried and convicted on a charge of rape. The jury added to the verdict the death penalty.[1]

Three points should be discussed. The first point concerns a confession. The rape occurred at about six o'clock in the evening on April 7, 1954, in the furnace room in the basement of the apartment house where the complaining witness lived. The assailant was masked. The janitor's quarters were also in the basement and were occupied by the janitor and his wife, two grown sons, and a younger son. Appellant Mallory, a half brother of the janitor, had also been living in the janitor's quarters for about six weeks prior to the day of the crime. The investigating police officers suspected Mallory and his two grown nephews. Mallory and one of the nephews had left the place immediately after the crime. Mallory was found and arrested at about two-thirty on the afternoon following the crime, April 8th. He and the two nephews were taken to police headquarters and questioned for a short time. At some time after four o'clock all three agreed to take lie detector tests. Some delay occurred while the officer in charge of the polygraph was located. During this interval a meal was served to the three men, no further interrogation occurring during this time. Until the lie detector tests began the three men were together. They were examined one after the other, the two nephews first, and finally, at about eight o'clock, the officer began his examination of Mallory. At about nine-thirty Mallory admitted guilt, describing in detail what had occurred, and immediately thereafter he repeated his account to two other officers. Sometime after ten o'clock the police telephoned the home of the United States Commissioner. That official was not available. At ten-forty-five Mallory was given a physical examination by a deputy coroner and was found to be in good physical condition. Mallory told this officer he had no complaints to make, except for a slight cold; he said he had not been struck or threatened and no promises had been made. At about eleven o'clock he was confronted by the complaining witness. Between eleven-thirty, p. m., and twelve-thirty, a. m., he dictated his confession to a stenographer, who typed it. This typewritten document was admitted in evidence at the trial.

given by the plaintiff was of a character likely to influence the jury, and we cannot doubt it was prejudicial to the defendant." See also McBoyle v. United States, 10 Cir., 1930, 43 F.2d 273, 275; Warren Live Stock Co. v. Farr, 8 Cir., 1905, 142 F. 116, 117; Ward v. Blake Mfg. Co., 8 Cir., 1893, 56 F. 437, 441.

I express no opinion as to whether appellant's counter-evidence should have been admitted on some theory related to entrapment or subornation, as urged by appellant, or as affecting the credibility of the Government's witnesses.

1. 31 Stat. 1322 (1901), as amended, D.C. Code § 22–2801 (1951).

■ Mallory says his confession was inadmissible under the so-called McNabb rule.[3] We have discussed this rule in recent cases.[3] We think the confession in the case at bar was properly admitted. The delay which occurred between the arrest and the confession was not unreasonable. The police had three suspects, and it is inconceivable that they should be required to lodge charges against any suspect until their investigation has developed with some certainty a justification for charges; provided always that the investigation is not unduly prolonged. Moreover there is no evidence that the confession was due to the delay, such as it was.

The second point concerns a statement made by the court to the jury. After the jury had been deliberating several hours it sent a note to the court. It asked, first, whether it had any choice of verdicts other than the four upon which it had been instructed, i. e., guilty with the death penalty, guilty as charged, not guilty by reason of insanity, or not guilty. The second question was:

"On No. 2 above: Can we the jury be assured that the defendant legally be imprisoned for the remainder of his natural life? No possibility of release—"

The court said:

"I can give you no such assurance. I think I might explain to you that the maximum term the Court can impose is 30 years, but even if the Court imposes the maximum, and of course I can, even if the Court imposes the maximum, the Court also has to impose a minimum sentence. So that the longest term that the Court can impose would be an indeterminate sentence of 10 to 30 years. The minimum has to be not more than a third of the maximum. Then at the end of the minimum sentence the Parole Board would have to decide whether the maximum should be served, or anything less than the maximum.

"So that I can give you no assurance that the defendant would legally be imprisoned for the remainder of his natural life if he is found guilty as charged."

The third request of the jury was for a reading of the code respecting rape. The judge read the statute [4] which provides that the penalty for rape shall be imprisonment for not more than thirty years, with a proviso that the jury may add to a verdict of guilty the words "with the death penalty".

It is strongly, and with reasonable basis, urged upon us that the above-quoted statement of the trial judge was error. It is said that in the first place a possible sentence, other than the death sentence, was of no concern to the jury, and that in the second place the statement permitted the jury to select the death sentence by comparison with other possible sentences although the jury had before it no data upon which it could evaluate such other sentences. The statement, appellant urges, enabled the jury to fix the death penalty because it did not want the defendant subject to release under any circumstance at the end of ten years. It is argued that the jury should have been required to make its determination as to the death sentence solely upon the basis of data before it, that is, upon the basis of the facts concerning the crime itself.

It is true that imposition of sentence by a judge under modern procedure and the imposition of sentence by a jury rest upon different bases. When a jury

2. McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943).

3. Pierce v. United States, 91 U.S.App.D.C. 19, 197 F.2d 189 (1952), certiorari denied, 344 U.S. 846, 73 S.Ct. 62, 97 L.Ed. 658 (1952); Allen v. United States, 91 U.S. App.D.C. 197, 202 F.2d 329 (1952), certiorari denied, 344 U.S. 869, 73 S.Ct. 112, 97 L.Ed. 674 (1952); Tillotson v. United States, 97 U.S.App.D.C. 402, 231 F.2d 736 (1956), certiorari denied, 351 U.S. 989, 76 S.Ct. 1055, 100 L.Ed. ——; Watson v. United States, 98 U.S.App.D.C. 221, 234 F.2d 42 (1956).

4. Supra note 1.

fixes the sentence for a crime it must do so upon the basis of the information before it. That information consists of the evidence presented during the trial and so is limited to data which is relevant and material to the alleged crime. Hence, when a jury is required to pass upon the death penalty, it must do so upon the basis of evidence concerning the crime itself. But, when a federal judge in modern times imposes sentence after a jury verdict, he has before him a presentence report, which contains the prior criminal record, if any, of the defendant and information about his characteristics, financial condition, and circumstances affecting his behaviour.[5] Thus in modern penology the element of rehabilitation looms large. The judge chooses the sentence to be imposed upon the basis of much material other than that relating to the crime itself. A jury, under present procedure, cannot make a choice upon that basis.

■ Forceful though we think the foregoing considerations to be, we think appellant's argument cannot be sustained. Unlike the situation in the ordinary case, the jury had a serious responsibility in respect to punishment for this crime. They had a right to know what the law is upon that punishment. Thus, clearly, they had a right to know that the punishment other than death is imprisonment for not more than thirty years. But the phrase in this statute— "for not more than thirty years"—is not the whole of the law upon the matter; standing alone it is not an accurate reflection of the law. A minimum sentence is required, and parole applies. The trial judge did no more than state accurately the whole law in respect to punishment for this crime. He did not attempt to forecast what might happen or to elaborate in any way. He did no more than

state the law upon the point, and the point was one for the jury in this case. We think the jury was not remiss in seeking to know the alternative sentences as an aid to an intelligent decision upon the problem imposed upon them by the statute; i. e., whether the death sentence was the proper imposition. We think the trial judge was not in error when in response to the request he gave the jury accurately the whole of the law respecting punishment for this offense.

■ Mallory's third point is that the admission into evidence of articles of clothing worn by him at the time of the alleged crime was error. He relies on Nelson v. United States[6] and Judd v. United States.[7]

Immediately after Mallory signed a confession officers questioned him about his clothing. He told them it was in the janitor's apartment, which adjoined the furnace room where the rape occurred. He gave written permission to go to the apartment and get the clothes and accompanied two officers on that errand. The shorts, coat, shirt and trousers bore seminal stains.

Mallory argues that his consent to the search was not clearly shown to have been without duress or coercion. We think it was, and, moreover, the consent was an immediate accompaniment to a confession of the crime and derives color from the confession.[8] In Judd and Nelson no confession was involved. Here, since Mallory had already confessed to the crime itself, in the absence of evidence to the contrary his express consent to the taking of specific property involved in the crime must be treated as being of the same voluntary nature. We find no error in this respect.

The judgment of the District Court will be

Affirmed.

5. Fed.Rules Crim.Proc. 32(c), 18 U.S.C.A. See Williams v. New York, 337 U.S. 241, 246, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949).

6. 93 U.S.App.D.C. 14, 208 F.2d 505 (D.C. Cir.1953), certiorari denied, 346 U.S. 827, 74 S.Ct. 48, 98 L.Ed. 352 (1953).

7. 89 U.S.App.D.C. 64, 190 F.2d 649 (D.C. Cir.1951).

8. Cf. United States v. Mitchell, 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140 (1944).

BAZELON, Circuit Judge (dissenting).

I cannot agree with the court's conclusions that (1) a proper answer was given to the jury's inquiry as to whether a sentence of imprisonment would assure appellant's confinement for the rest of his natural life; and (2) the admission in evidence of the confession was proper under the McNabb rule.

## I.

It would appear, as the majority says, that it is generally proper for a trial judge to inform the jury of "the alternative sentences as an aid to an intelligent decision upon the problem imposed upon them by the statute." See Taylor v. United States, 1955, 95 U.S.App.D.C. 373, 379, 222 F.2d 398, 404. The judge must be ever wary, however, that the efficacy of the additional information be not far outweighed by palpable prejudice to the defendant.

This jury did not request information as to alternative sentences. It requested an *assurance* that if it did not impose the death sentence, the defendant would nevertheless receive a term long enough to make him die in prison; and that his sentence would not thereafter be modified by the judge, or commuted or pardoned by the executive or shortened by the parole authorities. "In the instant case, this is what the jury wanted to know, and its purpose in seeking information is too plain for argument." Coward v. Commonwealth, 1935, 164 Va. 639, 178 S.E. 797, 800. The information the judge supplied, in the light of the jury's purpose in requesting it, was grossly prejudicial to the appellant.

## II.

Appellant was arrested at 2:30 p. m., but the police made no attempt to bring him before a committing officer until some time after 10:00 p. m., when they telephoned the home of the United States Commissioner and found he was unavailable. Rule 5(a), F.R.Crim.P., requires

that an arrested person be taken before a committing officer "without unnecessary delay". As I pointed out in my dissenting opinion in Green v. United States,[1] whether a delay is "unnecessary" is determined by the circumstances of the case. Were this a case of unavoidable delay, as in Green, I would say, as I did there, that the police might have attempted to legitimatize the confession by giving the prisoner, in advance of interrogation, the advisory statement which the commissioner would give him under Rule 5(b). But no advisory statement was made here; and, even if it had been, it could not, in the circumstances of this case, have saved the confession from exclusion under McNabb.

The delay in taking appellant before a committing officer was the deliberate choice of the police and not the result of unavoidable circumstances. The arrest occurred during regular business hours and in taking appellant to police headquarters immediately thereafter police passed within earshot of many of the approximately 50 officers,[2] authorized by law to commit accused persons. Clearly the delay was "unnecessary" in the usual sense of the word. In Akowskey v. United States, 81 U.S.App.D.C. 353, 158 F.2d 649 (1946), the arrest was made between 3:30 and 4:00 p. m. and "No effort was made by the arresting officers to take the men before a committing magistrate until about 5:00 or 5:30 o'clock p. m. when an unanswered telephone call was made to the United States Commissioner's office." We said:

"The Commissioner and several other committing magistrates before whom the accused might have been taken for a hearing had their offices on or near the axis connecting the place of arrest and the place of detention. It is only reasonable to conclude that the parties could have been transported to the office of one of these officials in less time than it took to get to police headquarters. It is furthermore both by law and

1. 98 U.S.App.D.C. 413, 236 F.2d 708, 716.

2. See 18 U.S.C. § 3041 (1952).

practice true that application for hearing might have been made to any of these committing magistrates at any hour. It follows that the detention was inexcusable and illegal at the outset." 81 U.S.App.D.C. at page 354, 158 F.2d at page 650.

In the present case the majority hold the delay "not unreasonable," because there were three suspects. They say "it is inconceivable that [the police] should be required to lodge charges against any suspect until their investigation has developed with some certainty a justification for charges".

The policy of discouraging the airing of reckless charges is commendable. But another and more commendable policy is that the police should not arrest any person on mere suspicion,[3] hoping that, once they have him at headquarters, they can obtain from his own lips something to justify the arrest.[4] To me the "inconceivable" thing is that this court should permit detention—for any length of time—for that purpose and without the intercession of a responsible committing officer.[5] The law lets policemen arrest, but delegates to magistrates the judgment whether to detain.[6] The law's requirement of arraignment without unnecessary delay is grounded upon the theory that, where policemen are judges, individual liberty and dignity cannot long survive.[7]

The police here preferred[8] to arrest a number of suspects and grill all of them until one admits something which justifies his arraignment.[9] But the law de-

3. "Suspicion is one thing; reasonable cause for suspicion is frequently quite another thing." United Cigar Stores Co. v. Young, 1911, 36 App.D.C. 390, 404.

4. " * * * the law demands that 'reasonable cause for prosecution of the defendant must exist before his arrest is justifiable.' Davis v. United States, 16 App.D.C. [442], 454; Kirk v. Garrett, 84 Md. 405, 35 A. 1089." United Cigar Stores Co. v. Young, 1911, 36 App.D.C. 390, 403. See also Carroll v. United States, 1925, 267 U.S. 132, 156, 45 S. Ct. 280, 286, 69 L.Ed. 543: "The usual rule is that a police officer may arrest without warrant one believed by the officer upon reasonable cause to have been guilty of a felony * * *."

5. In Watson v. United States, 98 U.S.App. D.C. 221, 234 F.2d 42, the court held a written confession to have been improperly admitted in evidence. By way of dictum, it approved the admission of testimony as to somewhat earlier oral confessions. To the extent that this dictum gives a license to police to hold and question an arrested person all through the night, incommunicado, uncounseled and unwarned, for the purpose of obtaining from him the evidence to justify his detention at his eventual arraignment, I disagree with it.

6. Rule 5, F.R.Crim.P.; McNabb v. United States, 1943, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819.

7. "Zeal in tracking down crime is not in itself an assurance of soberness of judgment. Disinterestedness in law enforcement does not alone prevent disregard of cherished liberties. Experience has therefore counseled that safeguards must be provided against the dangers of the overzealous as well as the despotic. The awful instruments of the criminal law cannot be entrusted to a single functionary. The complicated process of criminal justice is therefore divided into different parts, responsibility for which is separately vested in the various participants upon whom the criminal law relies for its vindication." McNabb v. United States, 318 U.S. at page 343, 63 S.Ct. at page 614.

8. The Federal Bureau of Investigation, on the other hand, arrests no person without informing him that he need not answer questions, that any answers he gives may be used against him, and that he has a right to counsel. See Hoover, Civil Liberties and Law Enforcement, 37 Iowa L.R. 175, 182 (1952).

9. The requirement of Rule 5 that the police bring prisoners up for arraignment, even before they have what they think is sufficient evidence to satisfy the committing officer that there is "probable cause to believe" the prisoner's guilt, does not leave the police powerless to detect and apprehend criminals. The police may lawfully question witnesses and suspects. True they cannot make people answer their questions, but that they cannot lawfully do even when the suspect is under arrest. The only difference is that they will not have whatever advantage there may be in the automatic coercion of prison bars. If there is any prospect that a

nies them that privilege.[10]  Detention of prisoners without arraignment "for the very purpose of securing  *  *  *  confessions  *  *  *  refutes any possibility of an argument" that subsequent arraignment was " 'without unnecessary delay.' "  Upshaw v. United States, 1948, 335 U.S. 410, 414, 69 S.Ct. 170, 172, 93 L.Ed. 100.  However "this method of arresting, holding, and questioning people on mere suspicion" may be "in accordance with the 'usual police procedure of questioning a suspect  *  *  *.'  *  *  * it is in violation of law, and confessions thus obtained are inadmissible under the McNabb rule."  Ibid.[11]

Even if it be assumed [12] that solicitude for the prisoner may sometimes legally justify some postponement of his arraignment, this was not such a case.  The postponement here sprang from police solicitude for their prospects of obtaining a confession.  They held and questioned three prisoners until one confessed.  Then they arraigned the latter and released the other two.  This is not unlike the Akowskey case where the police arrested, detained and questioned three men who were under the shadow of suspicion, obtained a confession implicating two of them, and then arraigned those two and released the third.  And the detention here was just as "inexcusable and illegal".[13]

As an additional ground for its holding, the majority relies upon an alleged requirement of the McNabb rule of a showing that "the confession was due to the delay".  The reliance is apparently upon the dictum of this court in Watson v. United States,[14] which was, in turn, based upon dicta in Allen v. United States [15] and Pierce v. United States.[16] Since the views expressed in all three of those cases were dicta, we are, of course, not bound to follow them in deciding this case.  Moreover, our greater deference for the views of the Supreme Court than

person whom the police wish to question may flee or hide (as happened, indeed, in the instant case), they may, upon proper showing, procure an order placing him under bail and, if he fails to give bail, detaining him.  Rule 46(b), F.R.Crim.P. In this connection, it is worth noting that witnesses thus detained under a magistrate's order must be lodged in suitable accommodations to be provided by the Board of Commissioners, "other than those employed for the confinement of persons charged with crime, fraud or disorderly conduct."  D.C.Code § 4–144 (1951).

10.  Another area of criminal procedure in which case must yield to propriety was referred to in Powell v. United States, 1955, 96 U.S.App.D.C. 367, 372, 226 F. 2d 269, 274:  "No doubt it would be a boon to prosecutors if they could summon before a Grand Jury a person against whom an indictment is being sought and there interrogate him, isolated from the protection of counsel and presiding judge and insulated from the critical observation of the public.  But there is a serious question whether our jurisprudence, fortified by constitutional declaration, permits that procedure."

11.  In striking down the written confession in Watson, supra note 5, the court reveals the motivation which lies behind such " 'usual police procedure' ":  "The police undoubtedly knew that once the appellant was presented to a committing authority, they were obliged to file a complaint.  But then appellant would have received the benefit of Rule 5(b), and the police were not yet through with him.  The attitude, the purpose, could not better be shown than by the Government's argument to the jury.  The prosecutor said:  'They say why didn't we put him downstairs (in the cell block) and call him back the next morning.  Why? We would find the place crawling with attorneys telling him "You don't have to talk to the police." ' "  See also 1 Alexander, The Law of Arrests (1949) 628. The oral confessions which were approved *obiter dictum* in Watson obviously resulted from the same deprivation of rights which produced the condemned written confession.

12.  See Watson v. United States, supra note 5.

13.  1946, 81 U.S.App.D.C. 353, 354, 158 F.2d 649, 650.

14.  Supra note 5.

15.  91 U.S.App.D.C. 197, 202, 202 F.2d 329, 334, certiorari denied, 1952, 344 U.S. 869, 73 S.Ct. 112, 97 L.Ed. 674.

16.  91 U.S.App.D.C. 19, 197 F.2d 189, certiorari denied, 1952, 344 U.S. 846, 73 S.Ct. 62, 97 L.Ed. 658.

for our own should prevent us from following these dicta.[17]  I cannot agree that a confession produced by police interrogation during illegal detention of the accused can be admissible in a federal court.

After obtaining the written confession from appellant, the police also obtained from him a written consent to a search of the apartment where his clothes were. Certain clothes thus found were admitted in evidence.  I agree with the majority's statement that the consent to the search was "an immediate accompaniment to * * * and derives color from the confession."  On that account I would hold the one to have been as inadmissible as the other.

For the foregoing reasons, I would reverse the judgment of conviction and remand the case for a new trial.

---

17. Upshaw v. United States, 1948, 335 U.S. 410, 413, 69 S.Ct. 170, 93 L.Ed. 100; see Brown v. Allen, 1953, 344 U.S. 443, 476, 73 S.Ct. 397, 97 L.Ed. 469; and Stein v. New York, 1953, 346 U.S. 156, 187–88, 73 S.Ct. 1077, 97 L.Ed. 1522.