Clarence E. WATSON, Jr., Appellant,

v.

UNITED STATES of America, Appellee.

No. 12675.

United States Court of Appeals District of Columbia Circuit.

Argued Nov. 21, 1955.

Decided May 3, 1956.

Petition for Rehearing Denied July 11, 1956.

Mr. Jerome Powell, Washington, D. C. (appointed by this Court), for appellant.

Mr. Lewis Carroll, Asst. U. S. Atty., with whom Messrs. Leo A. Rover, U. S. Atty., at the time record was filed, and Frederick G. Smithson, Asst. U. S. Atty., were on the brief, for appellee.

Before PRETTYMAN, DANAHER and BASTIAN, Circuit Judges.

DANAHER, Circuit Judge.

On April 22, 1955, appellant, after a second trial, was sentenced to death by electrocution. He had been convicted on four counts of an indictment, the first count of which charged that on July 5, 1953, appellant "purposely and with deliberate and premeditated malice murdered Alyce O. Taggart by means of striking her about the head and body with a blunt instrument." The second count charged commission of the murder "purposely" while in the perpetration of a housebreaking; the third count charged the same murder "while attempting to perpetrate a rape." The fourth count specifically charged commission of the housebreaking which was included under count 2. The jury disagreed at the first trial.

Appellant at the time of the alleged offenses was a 19-year-old colored boy, employed as a handyman in a shoe shop at the Pentagon building. Miss Taggart

had been beaten to death during the early morning hours of July 5, 1953. A duckpin found near the body was assumed to have been the weapon used in the commission of the murder. There was evidence that on the evening of July 4, 1953, there had been on a desk in the decedent's room some money and church envelopes which were missing the following day. There was no other evidence of theft, in fact the Government conceded at the trial that a wrist watch on the wrist of the deceased woman had not been disturbed. According to admissions by the accused, he had entered the victim's room via a door from the Scotts Hotel hallway, but had made his escape through a window after removing a screen. Despite an exhaustive search, and notwithstanding the bloody condition of the corpse, the only fingerprints police could find were bloody fingerprints on a book beneath the body of the victim. They were not the fingerprints of the appellant and they were never identified. Pursuant to undisclosed information, Chief of Detectives Scott and three other police officers went to appellant's apartment on July 17, 1953. When appellant returned from work at 6:40 P.M., he was arrested, taken to headquarters about 7 P.M. and was fingerprinted. Commencing about 8 P.M. and for some 45 minutes, appellant was interrogated by police. Questioned again, commencing about 11 P.M., appellant was produced at a police "line-up" some time before midnight. Intermittent questioning was resumed about 12:30 A.M. Appellant was put through a lie detector test which was concluded about 3 A.M. Up to about 3:15 A.M. on the morning of July 18th, appellant denied any connection with the crimes here in question but shortly thereafter admitted his guilt. He then made a full oral confession

which was completed about 4 A.M., according to the testimony. Thereupon appellant was taken to the office of the Homicide Squad where he slept in a swivel chair until 7:30 A.M. Shortly after awakening, perhaps about 8 A.M., appellant, it was testified, repeated to Captain Felber of the Homicide Squad his previous oral confession. We have adduced this summary sufficiently to supply background for the appellant's claims of error which will now be discussed, but we will advert to yet other facts in due course.

■■ 1. Appellant claims the trial court should have accorded him the test for insanity as outlined in Durham v. United States,[1] but we there made it clear that the Durham rule was to be applied prospectively. As a result of examinations conducted within a few days of appellant's arrest, psychiatrists engaged by the Government advised the United States Attorney that appellant was competent to understand the nature of the proceedings against him and to assist counsel in the preparation of his defense, and that he was not insane on July 5, 1953. Examination of appellant's testimony of record confirms such conclusions, so far as the written word can justify acceptance of the doctors' reports. Still, on a new trial there should be a determination of competency, to be noted of record, pursuant to statute.[2]

2. Appellant next urges as error the denial of his motion for mistrial, grounded upon a question asked in cross-examination and appellant's reply, italicized in the following excerpt:

"Q. Lieutenant Sullivan gave you a fair understanding, didn't he? A. Yes, but in my opinion he was a little harsh.

"Q. You knew you were in there charged with first degree murder,

---

1. 1954, 94 U.S.App.D.C. 228, 214 F.2d 862, 45 A.L.R.2d 1430.

2. See Pub.L. No. 313, Act of Aug. 9, 1955, 69 Stat. 609, D.C.Code, § 24–301 and, so far as applicable, 18 U.S.C. § 4244 (1952); Gunther v. United States, 1954, 94 U.S.App.D.C. 243, 215 F.2d 493. The

file disclosed no order, merely a docket entry to indicate, the granting of a defense motion for mental examination. Nor does there appear to have been a judicial determination of the competency of the accused to stand trial.

didn't you? You weren't going to be mollycoddled. A. I didn't know whether I was charged with first degree murder or not.

"Q. You knew at that time that you were charged and subsequently convicted, were you not, of the rape of Althea Dixon on May 1, 1953, in the 1700 block of P Street, Northwest, isn't that correct? A. That is correct."

Then, the prosecutor asked the following question (R. 548):

"Q. *That is just a short distance away from the Scotts Hotel isn't it?* A. *A matter of four or five blocks, I guess.*" (Emphasis supplied.)

 While cross-examination as to appellant's prior conviction was permissible to impeach his credibility, the interpolation of the challenged question and answer borders on prejudicial error. We need not so decide. No objection was voiced at the time. Had it been promptly made, the trial judge could have instructed the jury to disregard and to give no weight to the question and the answer. Indeed, the prosecutor could have been admonished to the end that all possible adverse effect could have been dispelled from the mind of the jury, if the circumstances were deemed to call for such treatment. The question and answer here, however, seem to have been part of a rapid-fire series designed to demonstrate the falsity of appellant's testimony and thus to impeach his veracity, and not to have been intended insinuatingly to link appellant with another charge of rape committed by him in the vicinity of Scotts Hotel. We need say no more than this: even in the zeal of prosecution of an important capital case, Government counsel must exercise thoughtful restraint in framing his questions, having in mind possibly prejudicial error. Our observations will doubt-

less deter a repetition of such a question at a new trial.

3. We pass now to the most crucial question presented here, completely critical indeed, since there was no evidence which placed the accused at the scene of the crime except such as came from the appellant himself in the course, or as a result, of his various oral admissions. The trial judge could properly have found that Watson had failed to discharge his burden of proving that his early morning admissions were inadmissible. The same may be said of appellant's admissions to Captain Felber at 8 A.M. or shortly thereafter, on July 18, 1953.

On the record before us, testimony of the accused as to his alleged beating prior to his early morning admissions seems totally incredible and to be the product of desperation, not to be unexpected, perhaps, in a case where a man weighs his words against his life. The police officers said to be implicated denied beating Watson, but particularly telling against him was the testimony of Dr. Murphy and Dr. Magruder. Not only did the doctors find no evidence whatever of beating, but Watson told Doctor Murphy he had been well treated by the police. Important corroboration of the police testimony concerning Watson's early morning admissions came from a jail interrogator[*] who, on July 19, talked at length with the appellant who told the jail interrogator substantially the same version as was narrated by the police.

 Of course, we would not countenance the admission of evidence derived through the exercise of police brutality. As was the trial judge, we, too, are convinced that there had been no deprivation of constitutional rights. "So long as no coercive methods by threats or inducements to confess are employed, constitutional requirements do not forbid police examination in private of those in lawful custody or the use as evidence of information voluntarily given."[3] Rea-

---

[*] A classification officer who for jail records compiles the case history of each prisoner.

3. United States v. Carignan, 1951, 342 U. S. 36, 39, 72 S.Ct. 97, 99, 96 L.Ed. 48.

sonable inquiry was appropriate, despite information coming to the notice of the police, as a result of which suspicion was fastened upon Watson. "The police could hardly be expected to make a murder charge on such uncertainties without further inquiry and investigation."[4] Before complaint of serious crime is levied, appropriate inquiry is certainly to be permitted, both in the interests of society, and of the accused himself, for gross wrong can follow from a charge improperly and improvidently filed against an innocent man.[5] Thus, as of the hours so far mentioned, there was no "unnecessary delay," nor was it shown that the admissions were the fruits of wrongdoing by the police.

 But by the time Watson had concluded his admissions to Captain Felber, a very different situation developed. Certainly by 9 A.M., from the lips of the accused himself, the police were in possession of sufficient facts upon which they would have been fully justified in filing a complaint. However, they filed no complaint at 9 A.M. when the United States Commissioner might have been available. They filed no complaint at 10 A.M. when many of the judges in the District of Columbia might have been available. Watson was presented before no committing authority, then, or for many hours thereafter.[6] Had he been so presented, the committing authority could have advised Watson in accordance with the requirements of Rule 5(b).[7] The Government correctly observes in its brief: "Once a defendant is arrested and taken before a committing authority Rule 5(a) requires the arresting officers to file a complaint against him.[8] Accordingly, proper police procedure must proceed with caution even prior to an arrest." That is so. But the police knew at 3:30 A.M. that the accused had orally confessed. They explained their failure to prepare then a written confession reflecting the appellant's admissions on the ground that "the members of the Homicide Squad were working on another assignment and were unable to reduce the statement to writing." Moreover, they knew of the oral admissions before 9 A.M. About that hour, Deputy Chief Scott arrived at headquarters. Once again, for some 30 minutes, appellant narrated the incidents of the crime.

Instead of presenting the accused to a committing authority, the police handcuffed him to an officer. Then accompanied by the Deputy Chief, by the Cap-

---

4. Id. 342 U.S. at page 44, 72 S.Ct. at page 101.

5. See discussion, Tillotson v. United States, 1956, 97 U.S.App.D.C. 402, 231 F. 2d 736.

6. There is no showing of record that the United States Attorney's office was consulted at either of these mentioned business hours or, perhaps for many hours thereafter. The record before us is silent on the point beyond a stipulation that Watson was not arraigned until "between 2 and 3 o'clock in the afternoon of July 18th."

7. Fed.Rules Crim.Proc. rule 5(a) and (b), 18 U.S.C. provide:
"(a) An officer making an arrest under a warrant issued upon a complaint or any person making an arrest without a warrant shall take the arrested person without unnecessary delay before the nearest available commissioner or before any other nearby officer empowered to commit persons charged with offenses against the laws of the United States. When a person arrested without a warrant is brought before a commissioner or other officer, a complaint shall be filed forthwith.
"(b) The commissioner shall inform the defendant of the complaint against him, of his right to retain counsel and of his right to have a preliminary examination. He shall also inform the defendant that he is not required to make a statement and that any statement made by him may be used against him. The commissioner shall allow the defendant reasonable time and opportunity to consult counsel and shall admit the defendant to bail as provided in these rules."

8. Excerpt from Fed.Rules Crim.Proc. rule 5(a): "When a person arrested without a warrant is brought before a commissioner or other officer, a complaint shall be filed forthwith." (Emphasis supplied.)

tain of the Homicide Squad, by a police lieutenant, and three other officers, the appellant was taken to Scotts Hotel to re-enact the crime. And, still without the benefits of the provisions of Rule 5(b), the appellant carried out step by step, the series of actions which he said he had performed on the morning of July 5, 1953. He was then taken to his apartment where certain clothing was picked up, including a pair of trousers, the knee of which had been torn, as the appellant told the officers, as he climbed over the back fence when he left the scene of the crime. He was brought back to headquarters where, commencing at 11:55 A.M. the statements attributed to the appellant were reduced to a written confession, the typing of which continued until 2 P.M.

The written confession was received in evidence over the objection of the accused, so the question before us turns on the applicability of Rule 5(a) and (b)[9] to the facts here presented.

■■■ We have made it clear "that illegal detention before presentment to a committing magistrate, standing alone and without more, does not invalidate a confession made during its continuance, unless the detention produced the disclosure."[10]

Application of the rule thus stated turns upon whether, on the facts of a particular case, there was such unreasonable delay in arraignment as would render detention illegal, and if the detention were shown by the appellant to be illegal, whether such detention produced the disclosure.

■■■ Unlike the admissions made prior to 9 A.M., July 18, 1953, which we agree had been properly received, the written confession must be viewed in a very different light. It must be assumed that a committing authority was certainly available after nine in the morning. But there was no arraignment. The need to check into the factual background upon which a complaint might be based no longer existed. Reasonable cause for lodging a complaint was clear. The police undoubtedly knew that once the appellant was presented to a committing authority, they were obliged to file a complaint. But then appellant would have received the benefit of Rule 5(b), and the police were not yet through with him. The attitude, the purpose, could not better be shown than by the Government's argument to the jury. The prosecutor said: "They say why didn't we put him downstairs [in the cell block] and call him back the next morning. Why? We would find the place crawling with attorneys telling him 'You don't have to talk to the police.'" Thus, as in the Upshaw case,[11] it is clear that the appellant was not arraigned, and on the contrary was illegally detained after 9 A.M., "for the very purpose of securing these challenged confessions." We have no hesitancy in finding on this record that after 9 A.M. there was the "unnecessary delay" which conformity with the provisions of Rule 5(a) would have obviated.

Moreover, the second of the two standards to be found in Allen v. United States and Pierce v. United States,[12] was met, for we cannot doubt that "the detention produced the disclosure." The series of interrogations up to and through the admissions to Captain Felber were not shown to have been improperly procured, but they had their effect. They became part of the whole net which, cumulatively, taken with what happened after 9

9. Supra note 7.

10. Allen v. United States, 1952, 91 U.S. App.D.C. 197, 202, 202 F.2d 329, 334, certiorari denied 1952, 344 U.S. 869, 73 S.Ct. 112, 97 L.Ed. 674, cited "cf." in Brown v. Allen, 1953, 344 U.S. 443, 476, 73 S.Ct. 397, 97 L.Ed. 469; Pierce v. United States, 1952, 91 U.S.App.D.C. 19, 197 F.2d 189, certiorari denied 1952, 344

U.S. 846, 73 S.Ct. 62, 97 L.Ed. 658; cf. discussion in Tillotson v. United States, supra note 5, where there were no unreasonable delay and no coercion.

11. Upshaw v. United States, 1948, 335 U.S. 410, 414, 69 S.Ct. 170, 172, 93 L.Ed. 100.

12. Supra note 10.

A.M., was thrown about the appellant, enmeshing him in duress, however subtly applied. Commencing at 9 A.M., the Deputy Chief of Police appeared. Once again the prisoner was caused to repeat his admissions. Thereupon, handcuffed to a policeman, accompanied by five other police including high-ranking officers, appellant was caused to reenact the crime. A 19-year-old youth, sequestered from counsel or friends, surrounded by police, possessed of the knowledge that his earlier admissions had already implicated him, deprived of the warning advice which Rule 5(b) commands he shall have, over a period of hours reaching into two in the afternoon, confessed and signed a confession. Under the circumstances noted, that the developments during the detention after 9 A.M. produced the written confession, we cannot doubt.

 ▪ Thus, the written confession was inadmissible in the light of Allen v. United States and Pierce v. United States [13] interpreting Rule 5, Fed.Rules Crim.Proc., the cases [14] and the principles to be derived therefrom. Once the trial judge decided, properly we think, that the requirements of Rule 5 had been satisfied as to the oral admissions, the question of "voluntariness" was correctly left to the jury.[15] But the basic error as to the written confession was not cured by leaving simply the issue of voluntariness to the jury. It was for the trial judge to determine in accordance with the procedure outlined in McNabb v. United States,[16] whether Rule 5 had been satisfied in accordance with our standards. Measured as we have indicated, the circumstances fell short and in the failure so to rule, there was error.

 It is argued that from other evidence, notably the oral admissions coupled with physical facts, and the testimony of the doctors who examined the accused, appellant's guilt was overwhelmingly established, and receipt of the written confession as evidence could not possibly have prejudiced the accused. Even granting the conclusion of guilt, we cannot agree that there was no prejudice. It is impossible to tell what weight the jury gave to the formal written document, signed by the accused, who seemed so clearly to have had an intelligent understanding of the case and the degree of his participation in the crime. It is not for us to say that he was only slightly prejudiced. It is enough that he could have been prejudiced.[17]

Reversible error having crept into the case, it is our duty to set aside the judgment of conviction.

Reversed.

13. Supra note 10.

14. United States v. Carignan, 1951, 342 U.S. 36, 72 S.Ct. 97, 96 L Ed. 48; United States v. Mitchell, 1944, 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140; Upshaw v. United States, 1948, 335 U.S. 410, 69 S.Ct. 170, 93 L.Ed. 100; McNabb v. United States, 1943, 318 U.S. 332, 63 S. Ct. 608, 87 L.Ed. 819; Pierce v. United States, 1952, 91 U.S.App.D.C. 19, 197 F.2d 189, certiorari denied 1952, 344 U.S. 846; Allen v. United States, 1952, 91 U.S.App.D.C. 197, 202 F.2d 329, certiorari denied 1952, 344 U.S. 869, 73 S.Ct.

112, 97 L.Ed. 674; and see discussion, Tillotson v. United States, supra note 5.

15. United States v. Mitchell, supra note 14, 322 U.S. at page 69, 64 S.Ct. 893, 88 L.Ed. 1140.

16. Supra note 14, 318 U.S. at page 346, 69 S.Ct. 170, 93 L.Ed. 100; Nardone v. United States, 1939, 308 U.S. 338, 341–342, 60 S.Ct. 266, 84 L.Ed. 307.

17. Fiswick v. United States, 1946, 329 U.S. 211, 217–18, 67 S.Ct. 224, 91 L.Ed. 196; Kotteakos v. United States, 1946, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L. Ed. 1557.