George R. LaSHINE, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 19818.

United States Court of Appeals
District of Columbia Circuit.

Argued Sept. 19, 1966.

Decided Jan. 24, 1967.

Mr. David Peter Steinmann, Washington, D. C. (appointed by this court), for appellant. Mr. William W. Greenhalgh, Washington, D. C. (appointed by this court), also entered an appearance for appellant.

Mr. James A. Strazzella, Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty., Frank Q. Nebeker and Donald S. Smith, Asst. U. S. Attys., were on the brief, for appellee.

Before FAHY, MCGOWAN and TAMM, Circuit Judges.

McGOWAN, Circuit Judge.

Appellant and another were indicted under 18 U.S.C. § 500 which is addressed to various fraudulent transactions in respect of postal money orders. The codefendant was charged with falsely altering the face amounts of four such orders; and appellant, together with the co-defendant, was charged with falsely uttering such orders at four different liquor stores in the District of Columbia. Reversal of appellant's conviction is sought here on two grounds deriving from the admission in evidence of both oral and written confessions. One such ground is an asserted deprivation of a Sixth Amendment right to counsel; and the other is founded in Rule 5(a), FED.R. CRIM.P. It is the latter which we think merits examination in some detail hereinafter.[1] Our conclusion is that, on this record, the conviction may stand.

---

1. The right to counsel point was never raised by the defense at the trial. Although the *Mallory* objection was both subordinate and obscure in its articulation, we are not disposed to treat it, the Government to the contrary, as not having been raised at all. By no stretch of the imagination, however, can it be expanded to include a Sixth Amendment claim. A reference to Escobedo v. United States, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), was volunteered by the trial court, in the course of its final rulings at the close of the hearing out of the jury's presence, by way of observation that no *Escobedo* problem had been disclosed by the evidence just heard. In any event, we think this comment, although not necessitated by any defense objection, is not inaccurate in the light of the Supreme Court's characterization of *Escobedo* in Johnson & Cassidy v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L. Ed.2d 882 (1966). This court has declined to give retroactive effect to Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602 (1966); and we see no compelling reason to do so here. See Coleman v. United States, 125 U.S.App.D.C. ——, 371 F.2d 343 (1966), cert. denied 385 U.S. 1027, 87 S.Ct. 979, 17 L.Ed.2d 875 (Feb. 27, 1967); and see Luckett v. United States, No. 19,911, decided July 12, 1966, argued before *Miranda* and in which we received a supplemental memorandum requesting its application. In this latter case, we affirmed by order, citing *Johnson & Cassidy*.

## I

The Government's case was initially developed by testimony showing that the four money orders had been issued on April 25, 1964, in the face amount of $2 each. When presented at the liquor stores, alteration had been effected by the insertion of a digit before the "2". The sender was shown to be a "Mrs. Rosia Lorenzo," and the recipient was listed as "Angelo C. Lorenzo." Each order had been endorsed in the latter name, the utteror having introduced himself as Angelo Lorenzo and having used as identification a Maryland driver's license issued to Angelo Lorenzo.

The four liquor store owners testified. Three felt they could not positively identify anyone and could not be sure whether the forger was in the courtroom. Only one was completely positive in his courtroom identification of appellant as the man who had cashed the orders. This witness testified on cross-examination that a few days after the discovery of the forgery a postal inspector had visited his store and exhibited to him a "display" of pictures.[2]

At this point in the trial the jury was dismissed and the prosecution called Postal Inspector Ohrvall. He testified that the forged money orders came to his attention around April 29, and that on July 9, in company with Inspector Diserod, he went to Baltimore to see appellant who was in the custody of the Maryland authorities on another criminal charge. Appellant was brought to an office-like room in the jail to meet his visitors. Ohrvall identified himself and his companion, stated the purpose of their call to be that of inquiring about forged money orders, and produced the orders.[3] Ohrvall's testimony was that, upon being shown the orders, appellant immediately said that he had passed them and that the

---

[2]. It was thus approximately two weeks after the forgery that the store owner was given the opportunity to identify appellant.

[3]. Appellant alleges that the warning given him by the postal inspectors was insufficient, as a matter of law, to properly apprise him of his rights. A careful reading of the transcript does not support this allegation. During the course of a hearing out of the presence of the jury, Inspector Ohrvall testified, albeit somewhat ambiguously, that he first orally warned the defendant that he did not have to make a statement and then produced a typewritten card purporting to advise appellant concerning all of his rights, which the appellant read and acknowledged understanding. Any doubt concerning the timing of these warnings is dispelled by the Inspector's testimony in the presence of the jury where he made clear that he immediately advised the appellant that no statement need be made:

Q. Will you tell the ladies and gentlemen what you said to the defendant when you met him for the first time? How did the conversation start?

A. I identified myself as a United State Postal Inspector; I displayed my commission; introduced Inspector Diserod; and I told Mr. LaShine that I wanted to interview him with regards to these money orders which were in my possession and under investigation.

I advised him that he did not have to make a statement and produced a piece of paper on which was typewritten a statement to that effect.

Q. All right. Did you show him that statement?

A. Yes, sir.

The statement on the card referred to by Inspector Ohrvall read:

I make this statement of my own free will in order that the truth be known. No threats, promises or inducements have been made to me. I have been advised of my right to counsel and I am aware that this statement may be used in a court of law.

That LaShine understood the import of what he read is perfectly clear from his own testimony:

Q. Mr. LaShine, you told us that the Inspector brought out a card that he had in his wallet, is that correct?

A. He showed me a card.

Q. And did you read it?

A. Yes, I read it.

Q. Calling on your recollection, can you tell the Judge today what was on that card? I don't mean word-for-word. We don't expect you to do that, but can you tell the Judge generally what was on it?

A. That anything I might say may be brought against me and that I was

endorsements were his. Ohrvall thereafter asked appellant if he would "give a written statement" to the same effect, and appellant said he would. This statement was, so it is said, written by appellant in his own hand in a half-hour or less.

With this testimony taken in the hearing out of the presence of the jury, the prosecutor suggested to the court that defense counsel should indicate the basis of his objections to admissibility in order that relevant evidence might be introduced. Counsel replied that he was going to object on voluntariness grounds in that the admissions were coerced by reason of promises to see to it that appellant would be sent to the federal facilities at Lexington, Kentucky, and also because of appellant's incompetency in terms of his physical or mental condition. Counsel further stated that "these statements were made before he was formally charged with any crime, before he was indicted, while he was incarcerated, had been incarcerated for about ten days on another charge, and as a result thereof, he was under the *Mallory* [4] logic, and so forth. These were the fruit of an illegal detainment in so far as these charges were concerned and a speedy trial did not result therefrom and, therefore, they cannot be produced for that."

The taking of testimony with the jury absent was then resumed. Upon the completion of the examination of Inspector Ohrvall, the defense called a psychiatrist from St. Elizabeths to support the claim of incompetency. Appellant then took the stand and testified at length. His direct examination was concerned with matters bearing upon the alleged coercion by promises and the asserted incompetency. In the course of his testimony, he did say that he had agreed to talk with Inspector Ohrvall on the occasion of the latter's visit to the Baltimore jail, that he had at that time admitted passing the money orders, and that he had complied with a request to write down that admission. He stated from the stand that these pre-trial admissions were true.

With the evidence on admissibility in, the judge asked defense counsel to state, in the light of that evidence, his precise objections to admissibility. Counsel's response was:

> Your Honor, counsel for the Government has quite clearly defined the two bases upon which we request that the confession be suppressed. Number one, that it was involuntary because a promise was given and other external influences were working upon the mind of the Defendant at the time that he gave these statements; and secondly, that he was suffering from a mental defect or a mental illness at the time.

■■ The court then ruled that the evidence did not establish these objections.[5] Before calling the jury back in, however, the court asked defense counsel if he were abandoning his *Mallory* contentions. Counsel's first response was that he was not abandoning, but merely relying upon what he considered to be his strongest points. Pressed further by the court, counsel closed the colloquy by saying that he was still resting upon *Mallory* because, as he put it, the admissions were made in July and appellant was not in-

---

advised of my rights of counsel and there has been no promises or inducements made.

\* \* \* \* \*

Q. Now do you recall very clearly that when you read that you were advised of your right to counsel, don't you?

A. Yes, It was on there.

4. Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957).

5. There was ample record evidence for the judge's finding that no promises or inducements were given to the appellant.

During the hearing outside the presence of the jury, appellant, under questioning by the Assistant United States Attorney, reaffirmed that he gave the statement voluntarily:

Q. Going back to where it says, "No threats, promises or inducements have been made to me," when you wrote that on there, Mr. LaShine, was that a true statement?

A. I believed it to be true.

Q. It was true?

A. Yes.

dicted until September or November.[6] The judge then ruled that the evidence before him did not establish a violation of Rule 5(a); and he stated again his adverse rulings on the objections of incompetency and coercion. He concluded by noting that the issue of involuntariness would in due course be presented to, and passed upon by, the jury.

After the trial resumed before the jury, defense counsel notified the court that he had decided to defend upon the ground of insanity alone, and that he did not want the court to instruct the jury that it could consider the question of the voluntariness of the admissions. Counsel expressly reaffirmed this position after the evidence was all in and instructions were being discussed. He also told the jury in his opening statement, made after the Government had rested, that the defense was insanity, and, in his closing argument, he said:

> In my opening statement earlier, yesterday, as counsel for the Government suggested, we conceded, based upon the overwhelming evidence, that the Defendant LaShine did commit the alleged crimes. I didn't come out and say this. I suggested this. At this time we will concede it. He did commit these crimes. But your duty is to consider the defense and the defense that we have raised is insanity.

## II

As indicated earlier, we find no warrant in the record for overturning the trial court's findings and conclusions with respect to the central objection of voluntariness, in terms of both coercion by promise and competency, initially lodged against the admissions, if indeed that issue was still in the case after the decision by the defense not to pursue it

before the jury. We also put to one side the not insubstantial question of whether the essential purposes of Rule 5(a) are irretrievably compromised when there is a judicial admission to both court and jury of a fact which has earlier been claimed to be the subject of an improper extra-judicial statement.

We do think, however, that the tactical course pursued by the defense after the hearing out of the jury's presence illuminates the motivations with which that hearing was sought in the first place, and goes far towards explaining why the presentation by appellant of facts relevant to Rule 5 (a) was meagre indeed. The question we decide is whether, on the record made at that hearing, the judge demonstrably erred in finding that exclusion was not dictated by Rule 5(a). The evidence before him did not establish that, when Inspector Ohrvall set out for Baltimore, he had probable cause to arrest appellant. All that we know from the record is that one liquor store owner had apparently been visited theretofore by some otherwise unidentified postal inspector and had apparently picked appellant's picture out of a group of pictures exhibited to him. There is nothing in the record as to whether the same exhibition was made to the other three victims, although it is interesting to note that they were the three who could not positively identify appellant in the courtroom; if they had similarly failed in a photograph display, there would be all the more reason to approach appellant directly by way of investigation. In any event, that is precisely what Ohrvall did, and with appellant's conceded consent. One question was enough to elicit the all-important admission of guilt by appellant when confronted with the money orders.[7] Certainly as to this oral confession, we can-

---

6. This circumstance has no relevance to Rule 5(a), and is of a piece with the failure of the defense to try to develop a record relevant to *Mallory*.

7. Appellant displayed a willingness to confess that is startling at first glance. His motives are more adequately revealed by a close examination of his testimony:

> Q. * * *
> Now, you gave the Postal Inspector this statement and you told him you committed these crimes because you wanted to tell him the truth, didn't you?
> A. Because I wanted to go to Lexington, Kentucky, [the federal hospital

not say that the judge erred in his determination of admissibility.[8]

■■■ Neither in this court nor in the trial court has there been a differentiation by the defense between the oral confession, on the one hand, and the written statement, on the other. Although the latter appears to contain more details, the oral admission is unequivocal and complete in its impact on the issue of guilt or innocence. If the oral admission was forthcoming without a violation of Rule 5(a), then the admission of the written statement does not compel reversal unless the latter itself was either involuntary [9] or the fruit of an unnecessary delay within the time limitations of Rule 5(a). The trial judge's findings on voluntariness remain undisturbed; and it is not true that Rule 5(a) is *automatically* violated by the reduction to writing of an oral admission. The particular circumstances of that reduction may, on occasion, verge into the area of delay forbidden by Rule 5(a), in which event the admission of the written statement in addition to the oral will normally necessitate reversal. Cunningham v. United States, 119 U.S.App.D.C. 262, 340 F.2d 787 (1964); Watson v. United States, 98 U.S.App.D.C. 221, 234 F.2d 42 (1956). But such circumstances are not shown by this record.

The record, we remind, is unusual to the point of novelty, both in the conduct of the defense after the non-jury hearing and in the degree to which the defense in that hearing was preoccupied with its non-*Mallory* objections. The two things are not unrelated, and the net impression is one of a defendant who, from the outset, was more interested in establishing the defense of insanity than in resisting the proof of his commission of the acts charged.

Affirmed.

---

for drug addicts] and I thought that is the way I would go there.

Q. You thought you would get to Lexington if the Federal Government brought a prosecution?

A. Right.

Q. You were really hoping to be prosecuted by the Federal Government?

A. If the Government prosecuted me.

8. Appellant, in his brief, cites us to a number of cases which he says demand reversal. In Greenwell v. United States, 119 U.S.App.D.C. 43, 336 F.2d 962 (1964), on which he principally relies, the arrest was made on the authority of an outstanding federal warrant. There could be no question of probable cause. In the other decisions appellant urges as controlling, probable cause was apparent, and an arrest was in fact made. See Alston v. United States, 121 U.S.App.D.C. 66, 348 F.2d 72 (1965); Spriggs v. United States, 118 U.S.App.D.C. 248, 335 F.2d 283 (1964); Coleman v. United States, 115 U.S.App.D.C. 191, 317 F.2d 891 (1963); Mitchell v. United States, 114 U.S.App. D.C. 353, 316 F.2d 354 (1963). In affirming appellant's conviction, we in no way indicate that we accept the Government's contention that, once a suspect is legally detained by another arm of government, he can be questioned at will concerning other crimes without being taken before a committing magistrate. See Edmonds v. United States, 106 U.S.

App.D.C. 373, 273 F.2d 108 (*en banc* 1959); United States v. Coppollo, 281 F.2d 340 (2d Cir. *en banc* 1960), aff'd, 365 U.S. 762, 81 S.Ct. 884, 6 L.Ed.2d 79 (*per curiam* 1961). Compare Jones (Short & Jones) v. United States, 119 U.S.App.D.C. 284, 342 F.2d 863 (*en banc* 1964).

9. In Haynes v. State of Washington, 373 U.S. 503, 513, 83 S.Ct. 1336, 1343, 10 L.Ed.2d 513 (1963), Mr. Justice Goldberg, writing for the Court, stated:

The uncontroverted portions of the record thus disclose that the petitioner's written confession was obtained in an atmosphere of substantial coercion and inducement created by statements and actions of state authorities. We have only recently held again that a confession obtained by police through the use of threats is violative of due process and that "the question in each case is whether the defendant's will was overborne at the time he confessed," Lynumn v. State of Illinois, 372 U.S. 528, 534, 83 S.Ct. 917, 920, 9 L.Ed.2d 920, 922. "In short, the true test of admissibility is that the confession is made freely, voluntarily, and without compulsion or inducement of any sort." Wilson v. United States, 162 U.S. 613, 623, 16 S.Ct. 895, 40 L.Ed. 1090. See also Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568.

FAHY, Circuit Judge (dissenting).

Appellant and a co-defendant were convicted of fraudulently uttering four money orders known to have been altered, violations of 18 U.S.C. § 500. The alterations increased the face value of the money orders an aggregate of 310 dollars. Appellant was sentenced to imprisonment for twenty months to five years, service of this sentence not to begin, however, until the expiration of a ten-year sentence recently imposed upon him in Maryland for burglary.

A substantial part of the evidence adduced by the government at trial consisted of appellant's oral and written confessions, obtained from him by two Postal Inspectors while he was in the Baltimore City Jail on the Maryland charge. When visited there by the Inspectors appellant had been in jail twenty days. The record does not show that he had counsel for the state charge; counsel for the federal charges was appointed more than seven months after the confessions. Except on the issue of sanity, appellant's public trial was a formality.[1] In all substance he was convicted at the Baltimore jail, in private, without judge, jury or counsel. See the separate concurring opinions written by Mr. Justice Douglas and Mr. Justice Stewart in Spano v. New York, 360 U.S. 315, 325–327, 79 S.Ct. 1202, 3 L.Ed.2d 1265, which I think are pertinent although in *Spano* the confessor was under indictment.

At the time he confessed, appellant was about twenty-four years of age and indigent. He was suffering from a mental illness known as passive aggressive personality. His case history included two psychiatric examinations while in the military service, and disclosed that his mental illness had persisted since early childhood.[2] Moreover, appellant had a history of barbiturate addiction beginning when he was sixteen or seventeen.

Postal Inspectors Ohrvall and Diserod obtained the confessions. Inspector Ohrvall seems to have been the primary interviewer. He had spent thirty-five years in criminal work, had been involved in numerous cases in many states, and had studied law and accountancy. He agreed that he felt "pretty familiar with the criminal type" and said he had a great deal of experience with addicts and the "mentally deranged" as well.

When the two Inspectors went to the jail they had reason to believe and no doubt did believe that appellant had participated in the crime for which he was later indicted, 18 U.S.C. § 500. They had with them the money orders containing handwriting later identified as appellant's. These money orders had been passed to them by the "inspectors who made the initial investigation." The Inspectors must have known that appellant had already been identified by his picture. In its brief in this court the government says the record does not show that this identification was made before the visit of the Inspectors to the jail. The government's own witnesses demonstrate the contrary. The only witness able to identify appellant at trial had cashed one of the altered money orders for him on April 25, 1964. This witness testified that "less than sixteen days" later he made his first identification on the basis of photographs proffered by a

---

1. During its deliberation the jury requested eight government exhibits. Four were money orders which bore on the case of either appellant or his co-defendant; three related only to the case of the co-defendant. One exhibit was the written confession, which related only to appellant. The confession was not delivered to the jury, but it was read to them once again.

2. Pursuant to court order appellant was confined to St. Elizabeths Hospital from March 30 to June 2, 1965, for a mental examination. The diagnosis that appellant suffered from passive aggressive personality was the consensus of the examining staff which consisted of Dr. Owens and Dr. Economon, both psychiatrists, and Dr. Borriello, a psychologist. Dr. Owens not only testified that appellant was mentally ill when he confessed, but also that a drug addict, even when not in a state of withdrawal, "would be most susceptible to inducements or promises of anything, that is, to help himself * * *."

Postal Inspector.[3] Inspector Ohrvall did not visit appellant until July 9, 1964. The investigation had then focused on appellant.

Even if it could be said that the Inspectors were without probable cause to arrest appellant when they opened conversation with him at the jail, they did have probable cause a moment later; for Inspector Ohrvall began his testimony at the hearing on the motion to suppress as follows:

A. I told Mr. LaShine I wanted to talk to him about money orders which have been raised and passed in Washington, D. C., and I produced the money orders.

&ast; &ast; &ast; &ast; &ast; &ast;

Q. And you showed them to him?

A. Yes, Sir.

Q. All right what else happened?

A. He said: Yes, I passed them. I asked him if he had written the face of the orders or if he had just endorsed them. He stated that he had endorsed them.[4]

Though having this admission, the Inspectors remained with appellant for an hour or more. During that time they had appellant initial each money order, sign a written confession, and swear to it.

The confessions were objected to (1) as induced by promises to be sent to Lexington, Kentucky, for treatment of appellant's addiction,[5] (2) as involuntary on the grounds of appellant's mental illness, and (3) as "the fruit of an illegal detainment" under the "Mallory logic."

After the hearing outside the presence of the jury the trial judge ruled explicitly against the applicability of Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977. He also rejected the objections to the admissibility of the

confessions as involuntary and in violation of the *Mallory* rule. That the *Mallory* objection was preserved on the record appears from the following:

[Defense Counsel]: The record will show that in September or November he was indicted for these particular offenses. The rules require that a man will be taken speedily before a magistrate and charged with the offenses that will be the subject of the indictment. This was not done and it seems to me, not on the thought of a threshold statement but on the fact that there was a detention, notwithstanding its validity for other charges, but a detention for a length of time without informing the Defendant of what the pending charges would be made against him, this alone would be, it seems to me, in the general logic of the Mallory idea, sufficient grounds to suppress the confession.

The Court: He was not being detained on these charges, was he?

[Defense Counsel]: I grant you they were for other charges but, nevertheless, it seems to me to be a logical thought that if a man has several different charges in different jurisdictions pending against him, and he thought that he through a confession escaped any charges that might be brought against him, hadn't heard of them again, it may change his testimony, it may change his logic, his whole approach or his attorney's approach in another case in another jurisdiction. If my hunch is correct on this, and if this is one of the many bases why you bring a man speedily before a magistrate and charge him, then should not this logic prevail here on the question of suppressing this confession?

---

3. This Inspector is not otherwise identified in the record.

4. In response to a leading question from the prosecutor, the Inspector varied his account of what transpired during the opening moments of his confrontation of appellant. This second account was given shortly after the above quoted testimony at the hearing on the motion to suppress and was substantially repeated before the jury. See footnote 3 of the majority opinion for the account given in the presence of the jury.

5. The Inspector said, "He [appellant] mentioned something about having used narcotics." See also footnote 7 of the majority opinion for part of appellant's testimony in this regard.

I think it clear that the objections adequately disclosed their bases in law, and under the law I think the confessions were inadmissible. I lay aside for the moment the issue of voluntariness and treat the evidence in the light of the decisions of the Supreme Court in Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246; Escobedo v. State of Illinois, supra; and Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L. Ed.2d 1479.

Appellant had been in jail for twenty days. He was indigent. It does not appear that he had counsel, or had been advised by an impartial official, or in any other meaningful manner, of his right to counsel. If he had counsel, albeit only with respect to the Maryland charge, the confessions were inadmissible under the rationale of *Massiah*. If he did not have counsel, and there is no evidence of an opportunity to obtain counsel or advice with respect thereto followed by an intelligent waiver, then I would apply *Escobedo* in accordance with the same reasoning which led me, prior to *Miranda*, to apply *Escobedo* in my dissenting opinion in Jackson v. United States, 119 U.S. App.D.C. 100, 105, 337 F.2d 136, 141, cert. denied, 380 U.S. 935, 85 S.Ct. 944, 13 L.Ed.2d 822. Moreover, the *Mallory* rule, though fashioned in other circumstances, should exclude the confessions at the federal trial. The Inspectors had probable cause to arrest appellant on the federal charges, if not when the interrogation began then as soon as appellant acknowledged that he had passed the money orders.[6] Though not formally arrested on the federal charges, the "logic" of the *Mallory* rule applies because he was as if arrested. He was not at liberty. He was in compulsory custody. Where the issue as here is the admissibility of a confession Rule 5 of the Federal Rules of Criminal Procedure should be construed in the circumstances to require that appellant should have been taken before a magistrate without unnecessary delay if it were practicable to take him before a magistrate. If it were not practicable then a confession elicited by police interrogations comes within the logic of the *Mallory* rule. The fact that appellant was confined by Maryland on a Maryland charge well might have rendered impracticable a hearing before a magistrate, but this conferred no rights on the government to use in evidence confessions which would have been inadmissible were a hearing before a magistrate practicable. Insofar as the questioned evidence is concerned, appellant lost no right under federal law by reason of his detention by Maryland in a cell in a city jail.

Appellant was entitled to counsel. He could not have intelligently waived counsel, for he was not even told he had the right to have counsel appointed by the court. His confessions are thus governed not only by the logic of the *Mallory* rule, but also by the logic of the *Massiah* and *Escobedo* rules. It is of course possible to draw distinctions, but some of the factual differences favor appellant, particularly the coercive circumstances in which the confessions were obtained. Were we unable strictly to apply *Mallory*, *Massiah*, or *Escobedo*, the principles underlying those decisions, in the factual situation of appellant's case, should lead to the exclusion of the confessions under our supervisory power over the administration of criminal justice in this jurisdiction.

It cannot in reason be denied that the situation was coercive. Irrespective of *Mallory*, *Massiah*, and *Escobedo*, therefore, the confessions should have been excluded as involuntary based on appel-

---

6. If this approach allows the initial oral confession to be admitted, excluding only the subsequent written confession, the admission of the latter alone would require a new trial. Haynes v. Washington, 373 U.S. 503, 519, 83 S.Ct. 1336, 10 L.Ed.2d 513; Lynumn v. State of Illinois, 372 U.S. 528, 537, 83 S.Ct. 917, 9 L.Ed.2d 922; Spano v. New York, 360 U.S. 315, 324, 79 S.Ct. 1203, 3 L.Ed.2d 1265; Payne v. State of Arkansas, 356 U.S. 560, 567–568, 78 S.Ct. 844, 2 L.Ed.2d 975; Cunningham v. United States, 119 U.S.App.D.C. 262, 340 F.2d 787; Watson v. United States, 98 U.S.App.D.C. 221, 234 F.2d 42, 48.

lant's Fifth Amendment protection against compelled self-incrimination.[7]

In light of the evolution of the law pertaining to the inadmissibility of confessions obtained as a result of police interrogation, a simple basis for disapproval of their use in this trial is the decision of the Supreme Court in Miranda v. State of Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694.[8] Appellant's case clearly falls within the rule there laid down. And while the Supreme Court has not required Miranda to be applied to a trial which antedated it, the Court has not prohibited such application. Johnson v. State of New Jersey, 384 U.S. 719, 733, 86 S.Ct. 1772, 16 L.Ed.2d 882. It has been my view that our court should not apply Miranda to convictions already affirmed on direct appeal and later made the subject of collateral attack. The present case is not of that kind, for it was pending argument on direct appeal when Miranda was decided. I am not ready to hold that in every such situation Miranda should govern, but here the circumstances are so compelling that I would not withhold from this appellant the benefit of the principles established by the Supreme Court while his case was pending on direct appeal in this court.

Section 500 of Title 18, U.S.C., defining the crime of which appellant is accused, is a federal statute of general application, not a portion of the Code of the District of Columbia. The permission granted by the Supreme Court in Johnson to apply or not to apply Miranda to cases tried before June 13, 1966, was accorded the state courts in terms not necessarily applicable to federal courts enforcing federal criminal statutes. The latitude granted state courts found justification in the history of the problem peculiar to the states and in cases applying constitutional protection to the states.[9]

One cannot escape the conviction that the confessions made in the jail cell by appellant were compelled self-incrimination:

> [W]e hold that an individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation under the system for protecting the privilege [against self incrimination] we delineate today. As with the warnings of the right to remain silent and that anything stated can be used in evidence against him, this warning is an absolute prerequisite to interrogation.

> \*   \*   \*   \*   \*   \*

In order fully to apprise a person interrogated of the extent of his rights under this system then, it is necessary to warn him not only that he has the right to consult with an attorney, but also that if he is indigent a lawyer will

---

7. In Johnson v. State of New Jersey, 384 U.S. 719, 731, 86 S.Ct. 1772, 1780, 16 L.Ed.2d 882, the Court pointed out that its past decisions "treated the failure to warn accused persons of their rights, or the failure to grant them access to outside assistance, as factors tending to prove the involuntariness of the resulting confessions. See Haynes v. State of Washington, supra; Spano v. New York, supra."

8. See particularly Westover v. United States, 384 U.S. 494, 86 S.Ct. 1638, 16 L.Ed.2d 694, which is one of the cases decided with Miranda.

9. In Johnson the Court expressed concern for the disruption of the administration of criminal law and the necessary retrials, noting that law enforcement agencies had "fairly relied" on prior cases of the Court which dealt with state prosecutions. "Prior to Escobedo and Miranda, few States were under any enforced compulsion on account of local law to grant requests for the assistance of counsel or to advise accused persons of their privilege against self-incrimination." 384 U.S. at 731, 86 S.Ct. at 1780. Such has not been the case in the federal system. Prior to Escobedo its law enforcement agencies were subject to Rule 5, Fed.R.Crim.P., McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819, Mallory and Massiah.

be appointed to represent him. Without this additional warning, the admonition of the right to consult with counsel would often be understood as meaning only that he can consult with a lawyer if he has one or has the funds to obtain one. The warning of a right to counsel would be hollow if not couched in terms that would convey to the indigent—the person most often subjected to interrogation—the knowledge that he too has a right to have counsel present.[42] As with the warnings of the right to remain silent and of the general right to counsel, only by effective and express explanation to the indigent of this right can there be assurance that he was truly in a position to exercise it.

Miranda v. State of Arizona, *supra* at 471, 473, 86 S.Ct. at 1626, 1627 (footnote omitted).

After he was unsuccessful in obtaining exclusion of the confessions, counsel defended solely on the ground of insanity, as pointed out in the majority opinion. This can only be attributed to the fact that the court ruled the confessions admissible. Accordingly, if that ruling were error, I would not hold that appellant had waived his objections to the confessions. After the ruling counsel no doubt thought he could better help his client by relying upon the claim of insanity than by dwelling on the confessions themselves. Counsel's selection of this alternative does not cure the situation which caused it—the admission of statements violative of the rules of evidence.

It is not unlikely appellant could be convicted on admissible evidence of his handwriting, identification, and perhaps other evidence, unless acquitted by reason of insanity. But such outcome should await a trial in open court, free from confessions obtained as here in the Baltimore City Jail where in all substance appellant's actual trial took place.

I respectfully dissent.